UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:                                              Chapter 11

C & D FRUIT AND VEGETABLE CO., INC.,                Case No. 8:18-bk-997-CED

TRIO FARMS, L.L.C.,                                 Case No. 8:18-bk-998-CED

         Debtors.                                   *Jointly Administered under*
_____/                    *Case No. 8:18-bk-997-CED*

---

**A hearing on this Motion will be held on June 12, 2018, at 2:00 p.m. eastern time in Courtroom 9A, Sam M. Gibbons United States Courthouse, 801 N. Florida Avenue, Tampa, Florida, before the Honorable Caryl E. Delano, United States Bankruptcy Judge.**

---

### DEBTORS' MOTION FOR AUTHORITY TO SELL SUBSTANTIALLY ALL OF THEIR ASSETS FREE AND CLEAR OF LIENS AT AUCTION AND TO ASSUME AND/OR ASSIGN CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES TO SUCCESSFUL BIDDER

C & D FRUIT AND VEGETABLE CO., INC. ("**C&D**") and TRIO FARMS, L.L.C. ("**Trio Farms**"), as debtors and debtors in possession (collectively, the "**Debtors**"), file this *Motion for Authority to Sell Substantially All of Their Assets Free and Clear of Liens at Auction and to Assume and/or Assign Certain Executory Contracts and Unexpired Leases to Successful Bidder* (the "**Motion**"). In support of this Motion, the Debtors would show:

#### Jurisdiction and Venue

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. The subject matter of this Motion is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper in this district pursuant to 28 U.S.C. § 1408. The statutory predicates for the relief sought in this Motion include 11 U.S.C. §§ 105, 363, 1107, and 1108 and Rules 2002, 6004, 6006, and 9014(a) of the Federal Rules of Bankruptcy Procedure.

**Background**

2.      On February 9, 2018 (the "**Petition Date**"), the Debtors filed their Voluntary Petitions for Relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**").  Pursuant to an order of this Court dated February 12, 2018, the Debtors' Chapter 11 cases are being jointly administered for procedural purposes only under *In re C & D Fruit and Vegetable Co., Inc.*, Case No. 8:18-bk-997-CED.

3.      For a detailed description of the Debtors' businesses and reasons for the Chapter 11 filings, please see the Case Management Summary (Doc. No. 8).

4.      The Debtors and a non-debtor, North River Properties Management, Inc. ("**North River**" and, collectively with the Debtors, the "**Companies**"), own the following assets: (a) approximately thirty-six (36) acres of real property located on State Road 64 East in Bradenton, Florida and owned by C&D (the "**Farm Parcel**"); (b) approximately 83,878 square feet of real property located in Palmetto, Florida and owned by North River, which is improved with eight (8) multifamily farm labor housing buildings on two contiguous parcels ("**Labor Parcel One**"); (c) approximately three (3) acres of real property located in Parrish, Florida and owned by North River, which is improved with one 4,625 square foot farm labor housing building ("**Labor Parcel Two**"); (d) approximately ten acres and a retail store located on State Road 64 East in Bradenton, Florida and owned by C&D (the "**Retail Parcel**"); and (e) certain farming equipment and vehicles (collectively, the "**Equipment**").  The Farm Parcel, the Labor Parcel One, the Labor Parcel Two, the Retail Parcel, and the Equipment are collectively referred to as the "**Assets**".

5.      The Debtors have determined, in the exercise of their business judgment, that it is in the best interests of their estates and their creditors to maximize value through a sale of the Assets.

6.      Subject to the approval of the Court, the Companies have engaged Equity Partners HG LLC ("**Equity Partners**") to market and sell the Assets and, on March 9, 2018, the Debtors filed an application with the Court to employ Equity Partners.  On March 21, 2018, the Court entered an order approving the employment of Equity Partners (Doc. No. 92).

7.      North River consents to the jurisdiction of the Court for the limited purposes of this Motion and the relief requested hereunder.

8.      In connection with the proposed sale by the Debtors of the Assets, on March 9, 2018, the Debtors filed their *Motion for Entry of an Order (I) Approving Bidding Procedures in Connection with the Sale of Substantially All their Assets, (II) Establishing Procedures for the Assumption and/or Assignment by the Debtors of Certain Executory Contracts and Unexpired Leases, (III) Approving Form and Manner of Notice of Bidding Procedures, and (IV) Setting Objection Deadlines* (Doc. No. 76) (the "**Bid Procedures Motion**").  The Bid Procedures Motion sought the approval of procedures in connection with the submission of bids for the purchase of the Assets.  All parties are directed to review the procedures set forth in the Bid Procedures Motion and the order granting same for the submission of bids and bid deadlines.  On March 23, 2018, the Court entered an order granting the Bid Procedures Motion (Doc. No. 98) (the "**Bid Procedures Order**").

9.      The Assets are encumbered by the following liens (collectively, the "**Liens**"):

(a)     Manatee County, Florida asserts a lien for unpaid real and personal property taxes in the amount of $ 31,848.13;

(b)     Farm Credit of Florida, ACA ("**Farm Credit**") asserts a lien on the Assets to secure a claim of approximately $3.5 million;

(c)     TCA Global Credit Master Fund, LP ("**TCA Global**") asserts a disputed secured claim in the amount of $610,000.00.  As further set forth in the Case Management Summary, the Debtors dispute these claims and liens of TCA Global; and

(d)     John Deere asserts a lien on three tractors owned by Trio Farms.

3

**Legal Relief Requested**

10.    The Debtors seek authority to sell the Assets free and clear of all liens, claims, and encumbrances, including but not limited to the Liens, pursuant to § 363(f) of the Bankruptcy Code, pursuant to the form of Asset Purchase Agreement attached hereto as **Exhibit A** (the "**Agreement**"), subject to such modifications to the Agreement agreed to by the Debtors as provided in the Bid Procedures Order.

11.    The Debtors will also seek to assume and/or assign those certain executory contracts and unexpired leases listed in the Agreement as further described below.

12.    Section 363(b)(1) states that the "trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  A debtor must demonstrate a sound business justification for a sale or use of assets outside the ordinary course of business. *See*, *e.g.*, *Licensing by Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380, 387 (2d Cir. 1997); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Global Crossing Ltd.,* 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003); *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989); *In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (stating that judicial approval of a section 363 sale requires a showing that the proposed sale is fair and equitable, a good business reason exists for completing the sale and the transaction is in good faith); *cf. In re Delphi Corp.*, No. 05-44481(RDD), 2009 WL 2482146, at *6 (Bankr. S.D.N.Y. July 20, 2009) (Drain, J.) ("Debtors have demonstrated compelling circumstances and a good, sufficient and sound business purpose and justification for the sale under section 363(b) and (f) of the Bankruptcy Code."). Courts usually defer to the business judgment of a debtor in deciding whether or not to authorize a debtor to sell property outside the ordinary course of business.  *See e.g.*, *In re Continental*

*Airlines, Inc.*, 780 F.2d 1223 (5th Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2nd Cir. 1983); *In re Mason's Nursing Center, Inc.*, 73 B.R. 360, 362 (Bankr. S.D. Fla. 1987).

13.      The Debtors have sound business justifications for selling the Assets at this time, as outlined herein.

14.      The Debtors will market the Assets up until the Bid Deadline (as defined in the Bid Procedures Order) of June 5, 2018 at 5:00 p.m. eastern time by continuing to engage prospective purchasers in bidding for the Assets and providing parties with continued access to a data room of confidential information on the Assets to all Bidders (as defined in the Bid Procedures Order).  In this way, the Debtors intend to maximize the number of participants who may participate as purchasers at the Auction (as defined in the Bid Procedures Order) to be held on June 11, 2018 at 1:00 p.m. eastern time and thereby maximize the value to be achieved from the sale of the Assets.

15.      The Debtors submit that the Agreement constitutes (or will constitute) the best offer for the Assets, and will provide a greater recovery for the Debtors' estates than would be provided by any available alternative.  Thus, the Debtors' entry into the Agreement, as the case may be, represents a sound exercise of their reasonable business judgment.

16.      The Debtors believe that the third party purchaser at the Auction will be a good faith purchaser entitled to the protections of § 363(m) and (n) of the Bankruptcy Code.

17.      Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

18.    Although the Bankruptcy Code does not define "good faith," the Second Circuit Court of Appeals, in *In re Gucci*, 126 F.3d 380 (2d Cir. 1997), has held that the:

> [g]ood faith of a purchaser is shown by the integrity of his conduct during the course of the sale proceedings; where there is a lack of such integrity, a good faith finding may not be made. A purchaser's good faith is lost by "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."

*Id.* at 390 (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978) (interpreting Bankruptcy Rule 805, the precursor to section 363(m) of the Bankruptcy Code)); *see also Bace v. Babbitt*, No. 07 Civ. 2420 (WHP), 2008 WL 800579, at *3 (S.D.N.Y. Mar. 25, 2008) (same) (quoting *Gucci*, 126 F.3d at 390); *In re Sasson Jeans, Inc.*, 90 B.R. 608, 610 (S.D.N.Y. 1988) (same) (quoting *Tompkins v. Frey (In re Bel Air Assocs., Ltd.*), 706 F.2d 301, 305 (10th Cir. 1983)).

19.    The Debtors submit that any third party purchaser is a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code. The consideration to be received by the Debtors pursuant to the Agreement is substantial, fair and reasonable. Accordingly, the Debtors seek a finding that the successful Bidder is a "good faith purchaser" under section 363(m) of the Bankruptcy Code and is entitled to the full protection thereof.

### *Approval Of Sale Transaction Free And Clear of Liens*

20.    The Debtors request approval to sell the Assets free and clear of any and all liens, claims and encumbrances, except for the Assumed Liabilities (as defined in the Agreement), in accordance with section 363(f) of the Bankruptcy Code. Pursuant to section 363(f) of the Bankruptcy Code, a debtor in possession may sell property of the estate "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

(a)    applicable nonbankruptcy law permits sale of such property free and clear of such interest;

6

(b)     such entity consents;

(c)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(d)     such interest is in *bona fide* dispute; or

(e)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); *see also Contrarian Funds, LLC v. Westpoint Stevens, Inc. (In re Westpoint Stevens, Inc.)*, 333 B.R. 30, 50 (S.D.N.Y. 2005) ("Where ... a sale is to be free and clear of existing liens and interests other than those of the estate, one or more of the criteria specified in section 363(f) of the statute must also be met."), *rev'd in part on other grounds* 600 F.3d 231 (2d Cir. 2010). This provision is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a); *see also Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) ("Authority to conduct such sales is within the court's equitable powers when necessary to carry out the provisions of Title 11.").

21.     The Debtors submit that the proposed sale will satisfy section 363(f) of the Bankruptcy Code and therefore the sale of the Assets should be approved free and clear of all liens, claims and encumbrances.

### *Approval of Assumption and/or Assignment of Contracts*

22.     The standard for a debtor to assume and assign or reject an executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code is whether the debtor's decision is made within its sound business judgment. *See, e.g.*, *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1098 (2d Cir. 1993) (noting that section 365 of the

Bankruptcy Code "permits the trustee or debtor-in-possession, subject to the approval of the bankruptcy court, to go through the inventory of executory contracts of the debtor and decide which ones it would be beneficial to adhere to and which ones it would be beneficial to reject").

23.     As stated above, the Debtors seek authority to assume and/or assign certain executory contracts and unexpired leases identified in Schedule 2.1(d) to the Agreement (if applicable) (collectively, the "**Assumed Contracts**"). The Debtors assert that, upon compliance with the procedures outlined above, they will have met all requirements of sections 365(b) and 365(f) of the Bankruptcy Code and should be permitted to assume and/or assign the Assumed Contracts to the successful Bidder.

24.     The assumption and/or assignment of certain Assumed Contracts, as may be identified by the successful Bidder, is provided for in the Agreement and is an integrated part of the sale.  In light of the proposed divestiture of the Assets, the Assumed Contracts to be assumed and/or assigned will in most cases no longer be necessary to the Debtors' reorganization and would constitute a burden on their chapter 11 estates and would be rejected.  By contrast, the Assumed Contracts to be assumed and/or assigned provide value to the successful Bidder and the purchase price set forth in the Agreement is being offered in part because of the value of such contracts to the successful Bidder.  Accordingly, the assumption and/or assignment of Assumed Contracts, if applicable, is warranted, in the Debtors' business judgment, to eliminate the ongoing liabilities associated therewith and to complete (and maximize the value of) the sale.  Assumption and/or assignment of the Assumed Contracts, is, thus, a sound and reasonable exercise of the Debtors' business judgment and should be approved.

## **NOTICE**

25.     This Motion is being served on (a) all creditors and parties listed on the Court's mailing matrices for these cases; (b) parties on the Local Rule 1007 List; (c) all applicable taxing authorities; (d) all parties which, to the knowledge of the Debtors, have liens on or have asserted liens or other interests in the Assets; (e) all lessors or other parties to the Assumed Contracts; and (f) any party that has previously expressed an interest in acquiring the Assets.

26.     Pursuant to the Bid Procedures Order, any objections to this Motion must be filed with the Court and served on the parties set forth in paragraph 3(c) of the Bid Procedures Order as to be actually received on or before June 5, 2018 at 5:00 p.m. eastern time.

27.     The Debtors request that the Court waive the fourteen (14) day stay of the order authorizing the sale of the Assets pursuant to Rule 6004(h).

WHEREFORE, the Debtors respectfully request that this Court approve the sale of the Assets to the successful Bidder at the Auction free and clear of liens and encumbrances, and for such other and further relief as may be just.

*/s/ Edward J. Peterson*
Edward J. Peterson (FBN 0014612)
Amy Denton Harris (FBN 634506)
Stichter, Riedel, Blain & Postler, P.A.
110 E. Madison Street, Ste. 200
Tampa, Florida 33602-4718
Telephone:  (813) 229-0144
Email: epeterson@srbp.com; aharris@srbp.com
Attorneys for Debtors

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing *Motion for Authority to Sell Substantially All of Their Assets Free and Clear of Liens at Auction and to Assume and/or Assign Certain Executory Contracts and Unexpired Leases to Successful Bidder* has been furnished on this 30th day of March, 2018, by either the Court's CM/ECF system or by U.S. Mail to all creditors and interested parties on the Court's mailing matrix.

*/s/ Edward J. Peterson*
Edward J. Peterson

Label Matrix for local noticing
113A-8
Case 8:18-bk-00997-CED
Middle District of Florida
Tampa
Fri Mar 30 14:03:20 EDT 2018

C & D Fruit and Vegetable Co., Inc.
P.O. Box 110598
Bradenton, FL 34211-0008

Ken Burton Jr., Manatee County Tax Collector
ATTN:Legal
1001 3rd Ave W, Suite 240
Bradenton, FL 34205-7871

Stichter, Riedel, Blain & Prosser, P.A.
110 Madison Street-Ste 200
Tampa, FL 33602-4718

Trio Farms, L.L.C.
P.O. Box 110598
Bradenton, FL 34211-0008

Accursio Packing & Produce, Inc.
P.O. Box 901767
Homestead, FL 33090-1767

Agri-Flow, Inc.
1815 Lakeview Dr.
Sebring, FL 33870-7929

Agri-Tech Services, Inc.
31940 Clay Gully Rd.
Myakka City, FL 34251-9488

Allied Portables, LLC
P.O. Box 61809
Fort Myers, FL 33906-1809

Bill's Discount Furniture
1001-9th St. W.
Bradenton, FL 34205-7330

Carb America, Inc.
800 W. Cypress Creek Rd., #110
Fort Lauderdale, FL 33309-2039

Cedar Point Nursery
P.O. Box 1447
Klamath Falls, OR 97601-0079

Central West Produce
511 E. Main St., Suite B
Santa Maria, CA 93454-4570

Chemical Dynamics, Inc.
P.O. Box 486
Plant City, FL 33564-0486

Clark Mueller Bierley, PLLC
c/o John H. Mueller, Esq.
5601 mariner St., Suite 230
Watermark 12 Building
Tampa, FL 33609-3451

Council Oxford, Inc.
P.O. Box 475
Ruskin, FL 33575-0475

Crop Production Services
12120 US Hwy 301 North
Parrish, FL 34219-8473

Crop Production Services, Inc.
c/o John H. Mueller
5601 Mariner Street, Suite 230
Watermark 12 Building
Tampa, FL 33609-3451

Dade Paper & Bag Co.
P.O. Box 593829
Orlando, FL 32859-3829

Dankee Transport, Inc.
P.O. Box 1591
Jupiter, FL 33468-1591

Department of Revenue
PO Box 6668
Tallahassee FL 32314-6668

Edward L. Myrick Produce, Inc.
1255 W. Atlantic Blvd., #320
Pompano Beach, FL 33069-2945

FL Forklift
P.O. Box 76054
Tampa, FL 33675-1054

Famous Software, LLC
8080 N. Palm Ave., #210
Fresno, CA 93711-5797

Farm Credit of Florida, ACA
1311 Hwy 17 N.
Wauchula, FL 33873-5009

Farm Credit of Florida, ACA
Christine L Myatt
Nexsen Pruet PLLC
PO Box 3463
Greensboro, NC 27402-3463

Farm Credit of Florida, ACA
Julius Davenport
11903 Southern Boulevard, Suite 200
West Palm Beach, FL 33411-7644

Farm Credit of Florida, ACA
Robert C Schermer
Greene Hamrick Perrey Quinlan & Schermer
PO Box 551
Bradenton, FL 34206-0551

Filmtech Corp.
P.O. Box 808
Lyndhurst, NJ 07071-0808

Fresh Start Produce Sales, Inc.
5353 W. Atlantic Blvd., #403-404
Delray Beach, FL 33484-8178

G W Allen Nursery Ltd.
7295 Hwy 221, RR #2
Centreville NS BOP1JO
CANADA

Gary Norman Produce
1045 Fairdale Way
Wellington, FL 33414-9039

Goodson Farms, Inc.
P.O. Box 246
Balm, FL 33503-0246

Hecht Manatee Property, Ltd.
P.O. Box 350940
Miami, FL 33135-0940

Helena Chemical Co.
c/o Noel R. Boeke Esq.,
P.O. Box 1288
Tampa, FL 33601-1288

Helena Chemical Company
c/o Noel Boeke, Esq.
Holland & Knight
100 N. Tampa Street, Suite 4100
Tampa, FL 33602-3644

Highland Packaging Solutions
1420 Gordon Food Svd Rd.
Plant City, FL 33563-7000

Highland Packaging Solutions, Inc.
c/o Trenam Law
Lara R. Fernandez
101 E Kennedy Boulevard, Suite 2700
Tampa, FL 33602-5150

Highland Packaging Solutions, Inc.
c/o Trenam Law
Rhys P. Leonard
101 E Kennedy Boulevard, Suite 2700
Tampa, FL 33602-5150

Howard Fertilizer & Chemical
P.O. Box 978926
Dallas, TX 75397-8926

Howard Fertilizer & Chemical Company Inc
c/o Michael A. Paasch, Esq.
Mateer & Harbert, PA
PO Box 2854
Orlando, FL  32802-2854

Howard Fertilizer & Chemical Company, Inc.
Attn:  Wade P. Krett, Treasurer & CFO
P O Box 628202
Orlando  FL  32862-8202

Integrity Distribution Services, LLC
10701 Corporate Dr., #154
Stafford, TX 77477-4013

Internal Revenue Service
P.O. Box 7346
Philadelphia, PA 19101-7346

International Paper
Ana Hernandez
Regional Credit Manager
1740 International Drive
Memphis, TN 38197-0103

James Irrigation
26606 Gopher Hill Rd.
Myakka City, FL 34251-4108

Jason L. Margolin, Esq.
Akerman LLP
401 E. Jackson St., Suite 1700
Tampa, FL 33602-5250

John Deere Financial
P.O. Box 6600
Johnston, IA 50131-6600

John J Jerue Truck Broker, Inc.
3200 Flightline Dr., #202
Lakeland, FL 33811-2807

Keen Farm & Grove, Inc.
P.O. Box 203
Parrish, FL 34219-0203

Keith Revell
1337 Dena Circle
Wauchula, FL 33873-8406

Ken Burton, Jr., Manatee County Tax Collecto
c/o Patti W. Halloran, Esq.
Gibbons Neuman
3321 Henderson Blvd.
Tampa FL 33609-2921

Kennco Mfg., Inc.
P.O. Box 1158
Ruskin, FL 33575-1158

Kichler Farms Limited
306 Evergreen Hill Rd., RR#2
Simcoe, ON N3Y 4K1
CANADA

Leonard's Express, Inc.
P.O. Box 25130
Farmington, NY 14425-0130

Linda O'Brien
P.O. Box 110598
Bradenton, FL 34211-0008

MD Council & Sons, Inc.
P.O. Box 1246
Ruskin, FL 33575-1246

Manatee County Tax Collector
4333 U.S. 301 North
Ellenton, FL 34222-2413

Northern Air Heat & Refrigeration
3230 59th Dr. E., #106
Bradenton, FL 34203-1900

O'Brien Family Farms, LLC
P.O. Box 110598
Bradenton, FL 34211-0008

| | | |
|---|---|---|
| Packaging Corporation of America<br>P.O. Box 532058<br>Atlanta, GA 30353-2058 | Pallet One of FL, Inc.<br>P.O. Box 819<br>Bartow, FL 33831-0819 | Parrish Farms<br>P.O. Box 110598<br>Bradenton, FL 34211-0008 |
| Parrish Organics<br>P.O. Box 110598<br>Bradenton, FL 34211-0008 | Patterson Companies, Inc.<br>P.O. Box 4649<br>Plant City, FL 33563-0029 | Pepiniere A. Masse, Inc.<br>Justine Masse<br>256 Haut Riviere Nord<br>Saint-Cesaire, QC  J0L 1T0<br>CANADA |
| Pexco Produce Sales, Inc.<br>P.O. Box 855<br>Pompano Beach, FL 33061-0855 | Production Lareault, Inc.<br>90 rue Lareault, C.P. 96<br>Lavaltrie, QC  J5T 4A9<br>CANADA | Rodriguez Produce<br>3305 Little Acre Lane<br>Plant City, FL 33566-4793 |
| Root Solutions<br>P.O. Bo 1277<br>Arcadia, FL 34265-1277 | SMR Farms, LLC<br>14400 Covenant Way<br>Bradenton, FL 34202-8900 | Sensitech, Inc.<br>P.O. Box 742000<br>Los Angeles, CA 90074-2000 |
| Sizemore Farms<br>4339 State Road 60 West<br>Mulberry, FL 33860-6629 | Southern Corp. Packers, Inc.<br>P.O. Box 5309<br>Immokalee, FL 34143-5309 | Suburban Propane<br>P.O. Box 260<br>Whippany, NJ 07981-0260 |
| TCA Farms, LLC<br>c/o Jason L. Margolin, Esq.<br>401 E. Jackson St., Suite 1700<br>Tampa, FL 33602-5250 | TCA Farms, LLC<br>c/o Steven R. Wirth, Esq.<br>401 E. Jackson St., Suite 1700<br>Tampa, FL 33602-5250 | TCA Global Credit Master Fund, L.P.<br>c/o Steven R. Wirth, Esq.<br>Akerman LLP<br>401 E. Jackson Street, Suite 1700<br>Tampa, FL 33602-5250 |
| TCA Global Credit Master Fund, LP<br>3960 Howard Hughes Pkwy, #500<br>Las Vegas, NV 89169-5988 | TRC Farm & Industrial Supply<br>1024 Railroad St.<br>Belle Glade, FL 33430-1777 | Terrence Swaford<br>Regional Sales Manager<br>TriestAg Group, Inc.<br>7610 U.S. Hwy. 41 N.<br>Palmetto, FL 34221-9611 |
| Terry A.C. Gray, Esquire<br>4651 N. Federal Highway<br>Boca Raton, FL 33431-5133 | Terry A.C. Gray, Esquire<br>4651 N. Federal Hwy.<br>Boca Raton, FL 33431-5133 | Terry Supply Company<br>6211-17th St. E.<br>Bradenton, FL 34203-5097 |
| Thomas O'Brien<br>P.O. Box 110598<br>Bradenton, FL 34211-0008 | Tom O'Brien<br>P.O. Box 110598<br>Bradenton, FL 34211-0008 | TriEst Ag Group, Inc.<br>P.O. Box 448<br>Greenville, NC 27835-0448 |
| Tyco Integrated Security LLC<br>10405 Crosspoint Blvd<br>Indianapolis IN 46256-3323 | United Rentals, Inc.<br>6125 Lakeview Road #300<br>Charlotte NC 28269-2616 | United Rentals, Inc.<br>P.O. Box 100711<br>Atlanta, GA 30384-0711 |

Utopia Packing, LLC
P.O. Box 276
Myakka City, FL 34251-0276

Utopia Packing, LLC
c/o Stephenie Biernacki Anthony, Esq.
Anthony & Partners, LLC
201 N. Franklin St., Suite 2800
Tampa, FL 33602-5816

VB Walker Co., Inc.
P.O. Box 349139
Homestead, FL 33034-9139

Vigiron
201 W. Christina Blvd.
Lakeland, FL 33813-9812

Voyager Farms, LLC
P.O. Box 860
Parrish, FL 34219-0860

Water Check, Inc.
13547 Heritage Way
Sarasota, FL 34240-7507

Wilkinson-Cooper Produce, Inc.
P.O. Drawer 880
Belle Glade, FL 33430-0880

Wyco Produce, Inc.
1002 B South Chuch Ave.
#320527
Tampa, FL 33679-9222

iTrade Network, Inc.
P.O. Box 935209
Atlanta, GA 31193-5209

Michael A Paasch +
Mateer & Harbert PA
Post Office Box 2854
Orlando, FL 32802-2854

Stephenie Biernacki Anthony +
Anthony & Partners LLC
201 N Franklin Street, Suite 2800
Tampa, FL 33602-5816

Noel R Boeke +
Holland & Knight LLP
Post Office Box 1288
Tampa, FL 33601-1288

Benjamin E. Lambers +
Timberlake Annex
501 E. Polk Street, Suite 1200
Tampa, FL 33602-3945

United States Trustee - TPA +
Timberlake Annex, Suite 1200
501 E Polk Street
Tampa, FL 33602-3949

Robert C Schermer +
Greene Hamrick Perrey Quinlan & Schermer
PO Box 551
Bradenton, FL 34206-0551

Patti W Halloran +
Gibbons, Neuman, Bello, Segall & Allen
3321 Henderson Blvd
Tampa, FL 33609-2921

Amy Denton Harris +
Stichter Riedel Blain & Postler, P.A.
110 E Madison Street
Suite 200
Tampa, FL 33602-4718

John H Mueller +
Clark, Mueller, Bierley, PLLC
5601 Mariner Street, Suite 230
Watermark 12 Building
Tampa, FL 33609-3451

Lara Roeske Fernandez +
Trenam, Kemker, et al
PO Box 1102
Tampa, FL 33601-1102

Edward J. Peterson III+
Stichter, Riedel, Blain & Postler, P.A.
110 East Madison Street, Suite 200
Tampa, FL 33602-4718

Steven R Wirth +
Akerman Senterfitt
401 E. Jackson Street, Suite 1700
Tampa, FL 33602-5250

Christine L Myatt +
Nexsen Pruet PLLC
Post Office Box 3463
Greensboro, NC 27402-3463

Rhys P Leonard +
Trenam Kemker
101 East Kennedy Boulevard
Suite 2700
Tampa, FL 33602-5170

Jason L Margolin +
Akerman Senterfitt
401 East Jackson Street
Suite 1700
Tampa, FL 33602-5250

Shinn & Company, LLC +
1001 3rd Avenue, West, Suite 500
Bradenton, FL 34205-7857

Note: Entries with a '+' at the end of the
name have an email address on file in CMECF

The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.

(u)Crop Production Services, Inc.

(u)Caryl E. Delano
Tampa

(u)Equity Partners HG LLC

(u)Farm Credit of Florida, ACA

(u)Helena Chemical Company

(u)Highland Packaging Solutions, Inc.

(u)Howard Fertilizer & Chemical Company, Inc.

(u)International Paper

(u)Stichter, Riedel, Blain & Postler, P.A.

(u)TCA Farms, LLC

(u)TCA Global Credit Master Fund, L.P.

(u)Utopia Packing, LLC

(d)C&D Fruit and Vegetable Co., Inc.
P.O. Box 110598
Bradenton, FL 34211-0008

(d)FL Forklift
P.O. Box 76054
Tampa, FL 33675-1054

(d)Ken Burton Jr., Manatee County Tax Collect
Attn: Legal
1001 3rd Ave W, Suite 240
Bradenton, FL 34205-7871

(d)Trio Farms, LLC
P.O. Box 110598
Bradenton, FL 34211-0008

End of Label Matrix
Mailable recipients    115
Bypassed recipients     16
Total                  131

# EXHIBIT A

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is made and entered into, and effective for all purposes, as of _____, 2018(the "Execution Date"), by and among (i) **C&D Fruit and Vegetable Co., Inc.**, a Florida corporation ("C&D Fruit") and **Trio Farms, L.L.C.**, a Florida limited liability company ("Trio Farms" and, together with C&D Fruit, the "Debtors"), (ii) **North River Properties Management, Inc.**, a Florida corporation, ("North River" and together with the Debtors  the "Sellers"), and (iii) _____ (the "Buyer"). The Sellers and the Buyer are sometimes referred to below individually as a "Party" and collectively as the "Parties".  Capitalized terms used in the Recitals of this Agreement and not defined therein shall have the meaning ascribed to such terms in Section 1.1 of this Agreement.

## RECITALS

WHEREAS, on February 9, 2018 (the "Petition Date"), C&D Fruit and Trio Farms filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Middle District of Florida, Tampa Division (the "Bankruptcy Court"), now being jointly administered under Case No.: 8:18-bk-00997-CED (the "Bankruptcy Case");

WHEREAS, from the Petition Date through the Execution Date, the Debtors have operated their businesses and managed their properties as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, the Sellers desire to sell to the Buyer, and the Buyer desires to purchase from the Sellers, the Purchased Assets, and the Buyer agrees to pay to the Sellers the consideration set forth in this Agreement including the assumption by the Buyer of the Assumed Liabilities, on the terms and conditions set forth in the Agreement and in accordance with Sections 105, 363, 365, 1129 and 1146 and other applicable provisions of the Bankruptcy Code (collectively, the "Transactions");

WHEREAS, on March 23, 2018, the Bankruptcy Court entered its Order Granting Debtors' Motion for Entry of an Order (I) Approving Bidding Procedures in Connection with the Sale of Substantially All of Their Assets, (II) Establishing Procedures for the Assumption and/or Assignment by the Debtors of Certain Executory Contracts and Unexpired Leases, (III) Approving Form and Manner of Notice of Bidding Procedures, and (IV) Setting Objection Deadlines;

WHEREAS, the consummation of the Transactions is subject to Court Approval; and

WHEREAS, the Sellers' Purchased Assets and the Assumed Liabilities include assets and liabilities of the Debtors which are to be purchased and assumed by the Buyer pursuant to (i) an order of the Bankruptcy Court approving the Transactions and granting the Sale Motion (the "Sale Order") pursuant to Sections 105, 363 and 365 of the Bankruptcy Code and applicable Bankruptcy Rules, and (ii) an order of the Bankruptcy Court approving the Transactions and confirming the Joint Plan (the "Confirmation Order") pursuant to Sections 1129 and 1146 of the Bankruptcy Code and applicable Bankruptcy Rules, which orders shall, among other things, include the authorization for the assumption by the Debtors of certain executory Contracts and unexpired real property leases and the assignment of such executory Contracts and unexpired real property leases to the

Buyer pursuant to Section 365 of the Bankruptcy Code, all in the manner and subject to the terms and conditions set forth in this Agreement, the Sale Order, the Joint Plan, and the Confirmation Order and in accordance with other applicable provisions of the Bankruptcy Code; and

WHEREAS, the Debtors believe after consideration of the available alternatives, that a sale of the Purchased Assets is necessary to maximize value and is in the best interests of the Debtors and their respective Estates and Creditors and other parties in interest.

## AGREEMENT

NOW, THEREFORE, for and in consideration of the premises and the agreements, covenants, representations and warranties hereinafter set forth and other good and valuable consideration, the receipt and adequacy of which are forever acknowledged and confessed, the Parties, intending to be legally bound, hereby agree as follows:

## ARTICLE I.
## DEFINITIONS; RULES OF CONSTRUCTION

1.1     Definitions.  For the purposes of this Agreement, the following capitalized terms shall have the meanings set forth below:

"Accounts Payable" means accounts payable and trade debt of any of the Sellers incurred in the Ordinary Course of the Business.

"Accounts Receivable" means all accounts, accounts receivable, rents, receivables, note receivables, promissory notes executed in favor of any Seller, and any other evidence of indebtedness of or rights to receive payment for goods or services provided by any Seller in connection with the Business prior to the Closing, billed and unbilled, recorded or unrecorded, with collection agencies or otherwise, including any such items that have been charged off as bad debt, together with all financial and billing records related to the Accounts Receivable.

"Action" means any written action, claim, proceeding, litigation, arbitration, mediation, suit, investigation or regulatory inquiry (whether civil, criminal, administrative or judicial), or any appeal therefrom or any material demand letter threatening the initiation of any of the foregoing.

"Affiliate" means, with respect to any Person, (i) any other Person which, directly or indirectly, is in control of, is controlled by, or is under common control with such Person, (ii) any other Person that, directly or indirectly, owns or controls, whether beneficially, or as trustee, guardian or other fiduciary, ten percent (10%) or more of the equity interests having ordinary voting power in the election of directors of such Person, or (iii) any other Person who is a director, officer, joint venturer, shareholder, member, or partner (a) of such Person, (b) of any subsidiary of such Person, or (c) of any Person described in clause (i) above.  For the purposes of this definition, control of a Person shall mean the power (direct or indirect) to direct or cause the direction of the management and policies of such Person whether through ownership of voting securities, by contract or otherwise.

"Agreement" means this Asset Purchase Agreement (including all Schedules and Exhibits to this Asset Purchase Agreement), as originally executed by the Parties and as this Asset Purchase

2

Agreement may be subsequently amended, restated, modified, or supplemented from time to time in accordance with its terms.

"Allocation Schedule" has the meaning set forth in Section 3.4(a) of this Agreement.

"Assignment Agreements" has the meaning set forth in Section 4.2(a)(vi) of this Agreement.

"Assumed Contracts" has the meaning set forth in Section 2.1(d) of this Agreement.

"Assumed Liabilities" has the meaning set forth in Section 2.3 of this Agreement.

"Assumption Agreement" has the meaning set forth in Section 4.2(a)(vii) of this Agreement.

"Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., as in effect on the Petition Date, together with all amendments and modifications thereto that were subsequently made applicable to the Bankruptcy Cases.

"Bankruptcy Court" means the United States Bankruptcy Court for the Middle District of Florida, Tampa Division, or, as the context requires, any other court of competent jurisdiction exercising jurisdiction over the Bankruptcy Cases.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as promulgated under Section 2075 of title 28 of the United States Code, and the Local Rules, as in effect on the Petition Date, together with all amendments and modifications thereto that were subsequently made applicable to the Bankruptcy Cases.

"Business" means the business conducted by the Sellers as of the Execution Date in connection with their ownership and operation of the Purchased Assets, which consists of the planting, growing, packing, shipping, sale, and marketing of fresh fruits and vegetables.

"Business Day" means any day other than a Saturday, a Sunday, or a day on which commercial banks in Tampa, Florida are authorized or required to close by Law.

"Buyer" has the meaning set forth in the Preamble to this Agreement.

"Buyer Disclosure Schedules" has the meaning set forth in the first paragraph of Article VI of this Agreement.

"C&D Fruit" has the meaning set forth in the Preamble to this Agreement.

"Cash Consideration" has the meaning set forth in Section 3.2 of this Agreement.

"CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601, et seq.

"Closing" has the meaning set forth in Section 4.1 of this Agreement.

"Closing Date" has the meaning set forth in <u>Section 4.1</u> of this Agreement.

"Closing Statement" means the closing settlement statement to be executed by the Sellers and the Buyer on the Closing Date reflecting any amounts payable by or on behalf of the Sellers or the Buyer in connection with the Closing.

"Code" means the Internal Revenue Code of 1986, as amended.

"Communication" has the meaning set forth in <u>Section 10.6</u> of this Agreement.

"Confidential Information" has the meaning set forth in <u>Section 7.5</u> of this Agreement.

"Contract" means any written agreement, arrangement, lease, mortgage, contract, note, power of attorney, insurance policy, covenant, understanding, commitment or instrument relating to the Business, the Purchased Assets or the operation thereof to which any Seller is a party or by which any of the Purchased Assets are bound.

"Confirmation Order" has the meaning set forth in the Recitals of this Agreement.  The Confirmation Order shall be in a form reasonably acceptable to the Debtors and the Buyer.

"Court Approval" means the entry of the Sale Order and the Confirmation Order by the Bankruptcy Court, together with all other orders of the Bankruptcy Court necessary to effect the Transactions.

"Deed" has the meaning set forth in <u>Section 4.2(a)(iv)</u> of this Agreement.

"Deere" means Deere & Company and shall include all of its Affiliates and their respective successors or assigns.

"Deere Closing Payment" has the meaning set forth in <u>Section 3.3(d)</u> of this Agreement.

"Deere Indebtedness" means the outstanding indebtedness due and owing to Deere under the Deere Loan Contracts as of the Closing Date as evidenced by payoff letters delivered to Trio Farms by Deere on or prior to the Closing Date.

"Deere Loan Contracts" means those Contracts set forth on <u>Schedule 1.1(a)</u> attached to this Agreement.

"Deere Permitted Assumption" has the meaning set forth in <u>Section 7.3</u> of this Agreement.

"Deposit" means the amount of Fifty Thousand and 00/100 Dollars ($50,000.00).

"Disclosure Schedules" means, collectively, the Sellers' Disclosure Schedules and the Buyer Disclosure Schedules.

"Dollars" or "$" means lawful currency of the United States of America.

"Employee Benefit Plan" means every plan, fund, contract, program and arrangement (whether written or not) that is maintained or contributed to by any Seller (or any member of its "controlled group" as that term is used in Section 414(b) or (c) of the Code) for the benefit of current or former employees of any Seller, including those intended to provide: (i) medical, surgical, health care, hospitalization, dental, vision, workers' compensation, life insurance, death, disability, legal services, severance, sickness or accident benefits (whether or not defined in Section 3(1) of ERISA); (ii) pension, profit sharing, stock bonus, retirement, supplemental retirement or deferred compensation benefits (whether or not tax qualified and whether or not defined in Section 3(2) of ERISA); (iii) bonus, incentive compensation, member interest option, member interest appreciation right, phantom member interest or member interest purchase benefits; or (iv) salary continuation, unemployment, supplemental unemployment, termination pay, vacation, holiday benefits or material fringe benefits (whether or not defined in Section 3(3) of ERISA.  The term "Employee Benefit Plan" also includes every such plan, fund, contract, program and arrangement: (a) that any Seller has committed to implement, establish, adopt or contribute to in the future; (b) for which any Seller has or may have any Liability as a result of the direct sponsor's affiliation to the applicable Seller or its owners (whether or not such affiliation exists at the Execution Date and notwithstanding that the plan is not maintained by such Seller for the benefit of its current or former employees); (c) that is in the process of terminating (but such term does not include any arrangement that has been terminated and completely wound up prior to the Execution Date such that no Seller has any present or potential Liability with respect to such arrangement); or (d) for or with respect to which any Seller has or may have any Liability under any common law successor doctrine, express successor liability provisions of Law, provisions of a collective bargaining agreement, labor or employment law, or agreement with a predecessor employer.

"Employees" means the individuals employed by the Sellers performing job functions for the Business.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Excluded Assets" has the meaning set forth in Section 2.2 of this Agreement.

"Excluded Liabilities" has the meaning set forth in Section 2.4 of this Agreement.

"Execution Date" has the meaning set forth in the Preamble to this Agreement.

"Executive Order" has the meaning set forth in Section 5.12 of this Agreement.

"Farm Credit" means Farm Credit of Florida, ACA and shall include all of its Affiliates and their respective successors or assigns.

"Farm Credit Indebtedness" means the outstanding indebtedness due and owing to Farm Credit under the Farm Credit Loan Documents as of the Closing Date as evidenced by payoff letters delivered to C&D Fruit and Trio Farms by Farm Credit on or prior to the Closing Date.

"Farm Credit Loan Documents" means, collectively, that certain Revolving Demand Note dated December 2, 2014 in the original principal amount of $2,108,000.00 made by C&D Fruit

and Trio Farms and payable to the order of Farm Credit, that certain Revolving Demand Note dated December 2, 2014 in the original principal amount of $1,392,000.00 made by C&D Fruit and Trio Farms and payable to the order of Farm Credit, all other documents evidencing the claims and Liens of Farm Credit against the Sellers or their Affiliates, and any and all other documents executed by the Sellers or their Affiliates, any guarantor or Farm Credit in any way relating to the foregoing, as any such documents have been amended, modified or supplemented thereafter in accordance with their terms.

"Final Allocation Schedule" has the meaning set forth in Section 3.5(a) of this Agreement.

"Final Order" means an order, judgment, ruling, or other decree (or any revision, modification, or amendment thereto) issued and entered by the Bankruptcy Court or by any state or other federal court that has jurisdiction over any proceeding in connection with the Bankruptcy Cases for the purpose of such proceeding, which order, judgment, ruling, or other decree has not been reversed, vacated, stayed, modified, or amended and as to which (i) no appeal, petition for review, reargument, rehearing, reconsideration, or certiorari has been taken and is pending and the time for the filing of any such appeal, petition for review, reargument, rehearing, reconsideration, or certiorari has expired, or (ii) such appeal or petition has been heard and dismissed or resolved and the time to further appeal or petition has expired with no further appeal or petition pending.

"Governance Documents" means, with respect to any entity, all documents (i) pursuant to which the legal existence of the entity is established, (ii) that were adopted or approved by the owners, board of directors, partners, members, managers or other similar management authority of the entity and set forth provisions for the regulation and management of the entity's internal affairs, and (iii) that are binding upon any owners of the entity and establish the governance, economic and/or other rights of such owners in their capacity as such.

"Government Entity" means any federal, state, local or foreign government, court, agency, commission, department or other authority or instrumentality.

"Hazardous Activity" means the use, handling, generation, manufacturing, distributing, importing, management, labeling, testing, processing, refinement, collection, storage, transfer, transportation, treatment, disposal, clean-up or Release of Hazardous Materials.

"Hazardous Materials" means any waste or other substance of any kind that is listed, defined, designated, classified or regulated under any Environmental Law as hazardous, radioactive or toxic or as a pollutant or contaminant.

"Intellectual Property" has the meaning set forth in Section 2.1(c) of this Agreement.

"Intellectual Property Assignment" has the meaning set forth in Section 4.2(a)(viii) of this Agreement.

"Knowledge of the Sellers" means the actual knowledge, together with the knowledge that would have been obtained after reasonable inquiry, of Thomas Martin O'Brien.

"Land Premises" has the meaning set forth in Section 2.1(b) of this Agreement.

6

"<u>Law</u>" or "<u>Laws</u>" means all applicable federal, state, local and foreign laws (including common law), codes, constitutions, statutes, rules, regulations, ordinances and policies, and all applicable orders, writs, judgments, arbitration awards, decrees, administrative or judicial promulgations, injunctions, rulings, determinations, agreements with, and rulings of or by any Government Entity.

"<u>Leased Real Property</u>" has the meaning set forth in <u>Section 5.8(b)</u> of this Agreement.

"<u>Leases</u>" has the meaning set forth in <u>Section 5.8(b)</u> of this Agreement.

"<u>Liability</u>" means any debt, liability, commitment or obligation of any kind, character or nature whatsoever, whether known or unknown, asserted or unasserted, liquidated or unliquidated, secured or unsecured, monetary or non-monetary, accrued, fixed, absolute, contingent or otherwise, and whether due or to become due.

"<u>Liens</u>" means all mortgages, claims, leases, options, hypothecations or similar restrictions, liens, pledges, security interests, and charging orders and any other encumbrance, right or interest of any kind or character, whether vested or contingent, that evidences or secures a debt or payment obligation or adverse ownership interest in the property or rights in question, whether imposed by agreement, understanding, law, equity or otherwise, or liens, interests or encumbrances both now existing or hereafter arising which would encumber the Purchased Assets arising under any agreement binding on any Seller or its property or arising from any act of any Seller or arising pursuant to any right, title or interest, lien or encumbrance which could hereafter be asserted as a result of the transfer of the Purchased Assets by any Seller.

"<u>Material Adverse Effect</u>" means any event, occurrence, fact, condition, change or effect that is, or is reasonably likely in the future to be, individually or in the aggregate, materially adverse to the Business or, as applicable, the Purchased Assets.

"<u>New Crop Expenses</u>" has the meaning set forth in <u>Section 3.3(c)</u> of this Agreement.

"<u>New Crops</u>" means the new crops to be planted and grown in the next season following the Closing Date.

"<u>Ordinary Course</u>" means, with respect to any Seller, the ordinary course of such Seller's business, consistent with past practice in nature, scope and magnitude.

"<u>Outside Closing Date</u>" has the meaning set forth in <u>Section 10.1(b)</u> of this Agreement.

"<u>Owned Real Property</u>" has the meaning set forth in <u>Section 2.1(b)</u> of this Agreement.

"<u>Owner's Policy of Title Insurance</u>" means the owner's policy of title insurance to be issued to the Buyer following the Closing by the Title Company through the Title Agent in accordance with the Title Commitment.

"<u>Parties</u>" and "<u>Party</u>" have the meanings set forth in the Preamble to this Agreement.

"<u>Patriot Act</u>" has the meaning set forth in <u>Section 5.12</u> of this Agreement.

"Permits" has the meaning set forth in Section 2.1(f) of this Agreement.

"Permitted Liens" means (i) any and all Liens for real estate Taxes, tangible personal property Taxes, assessments and other governmental charges for the calendar year in which the Closing occurs and subsequent years not yet due and payable, (ii) matters of title with respect to the Land Premises set forth in the Title Commitment, (iii) matters shown by the Survey, (iv) any and all Liens created by the Buyer in connection with the Transactions or any third party financing obtained by the Buyer, (v) inchoate statutory, mechanics', laborers' and materialmen's Liens arising in the ordinary course, and (vi) Liens arising in connection with worker's compensation and unemployment insurance which are not overdue or are being contested in good faith by appropriate proceedings and for which provision for the payment of such Liens has been reflected in the books and records of the applicable Seller.

"Person" means any person, individual, sole proprietorship, corporation, association, partnership, limited liability company, joint venture, trust, organization, unincorporated organization, institution, joint stock company, business, government, governmental agency or political subdivision thereof, Government Entity, or any other entity or institution of any type whatsoever.

"Preamble" means the first paragraph of this Agreement.

"Prohibited Person" has the meaning set forth in Section 5.12 of this Agreement.

"Purchase Price" has the meaning set forth in Section 3.2 of this Agreement.

"Purchased Assets" has the meaning set forth in Section 2.1 of this Agreement.

"Release" means a spill, leak, emission, discharge, deposit, dumping or other release into the environment, whether intentional or unintentional.

"Representatives" means, with respect to any Person, the directors, officers, members, managers, partners, shareholders, employees, financial advisors, attorneys, accountants, consultants, agents and other authorized representatives of such Person.

"Sale Motions" means, collectively, the Sale Motion and any subsequent motion filed by the Debtors in the Bankruptcy Cases seeking approval by the Bankruptcy Court of the sale of the Debtors' Purchased Assets to the Buyer.

"Sale Order" has the meaning set forth in the Recitals of this Agreement.  The Sale Order shall be in substantially the form attached to this Agreement as Exhibit A, and the final form of the Sale Order shall be in a form reasonably acceptable to the Debtors and the Buyer.

"Sellers" has the meaning set forth in the Preamble to this Agreement.

"Sellers' Disclosure Schedules" has the meaning set forth in the first paragraph of Article V of this Agreement.

"Sellers' Prior Year Taxes" has the meaning set forth in Section 3.3(a) of this Agreement.

"<u>Survey</u>" means that certain ALTA/NSPS Land Title Survey of the Owned Real Property dated _____, and bearing Job No. _____, by _____, a copy of which is attached to this Agreement as <u>Exhibit B</u>.

"<u>Tax</u>" or "<u>Taxes</u>" means all taxes, assessments, charges, duties, fees, levies or other governmental charges (including interest, penalties or additions associated therewith), including income, franchise, capital stock, real property, personal property, tangible, estimated withholding, employment, payroll, social security, unemployment compensation, disability, transfer, sales, use, franchise, excise, gross receipts, value-added and all other taxes of any kind imposed by any Government Entity, whether disputed or not, whether inchoate, accrued, invoiced, levied, or otherwise, and any charges, interest or penalties imposed or that may be imposed thereon by any Government Entity.

"<u>Tax Return</u>" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes of any kind or nature filed or required to be filed, including any schedule or attachment thereto, and including any amendment thereof.

"<u>Title Agent</u>" means Stichter, Riedel, Blain & Postler, P.A.

"<u>Title Commitment</u>" means the written commitment to issue the Owner's Policy of Title Insurance and specifically identified as Order No. 6380240 dated effective as of _____ at 5:00 p.m., a copy of which is attached to this Agreement as <u>Exhibit C</u>.

"<u>Title Company</u>" means Fidelity National Title Insurance Company.

"<u>Transaction Documents</u>" means the agreements, certificates, documents and instruments required to be delivered by the Parties pursuant to this Agreement.

"<u>Transactions</u>" has the meaning set forth in the Recitals of this Agreement.

"<u>Transfer Taxes</u>" means sales, use, transfer, real property transfer, recording, documentary, stamp, registration and other similar Taxes or fees in connection with the purchase and sale of the Purchased Assets.

"<u>Transferred Employees</u>" has the meaning set forth in <u>Section 7.2(a)</u> of this Agreement.

"<u>Trio Farms</u>" has the meaning set forth in the Preamble to this Agreement.

"<u>WARN Acts</u>" has the meaning set forth in <u>Section 7.2(d)</u> of this Agreement.

1.2    <u>Rules of Construction</u>.  The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  References herein to Articles, Sections, subsections, Schedules, Exhibits and the like are to Articles, Sections and subsections of, or Schedules or Exhibits attached to, this Agreement unless otherwise expressly provided.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  Unless the context in which used herein otherwise clearly requires, "or" has the inclusive meaning represented by the phrase "and/or".  Defined terms include in the singular number the plural and

9

in the plural number the singular.  Reference to any agreement, document or instrument means such agreement, document or instrument as amended or modified and in effect from time to time in accordance with the terms thereof, except where otherwise explicitly provided, and reference to any promissory note includes any promissory note which is an extension or renewal thereof or a substitute or replacement therefor.  Reference to any Law, rule, regulation, order, decree, requirement, policy, guideline, directive or interpretation means as amended, modified, codified, replaced or reenacted, in whole or in part, and in effect on the determination date, including rules and regulations promulgated thereunder.  When any reference is made with respect to information, documents or materials being supplied, provided or otherwise made available to a Person or such Person's Representatives, such information, documents, or materials shall be deemed to include any information, documents, or materials supplied, provided or otherwise made available in any written form in connection with this Agreement or the Transactions.  Disclosure made on any Disclosure Schedule attached to this Agreement shall be deemed to have been made on another Disclosure Schedule attached to this Agreement when it is cross-referenced in such other applicable section or Disclosure Schedule or is readily apparent on its face that such a disclosure would belong on such other Disclosure Schedule attached to this Agreement.

## ARTICLE II.
## THE PURCHASE AND SALE

2.1    Purchased Assets.  Subject to the terms, conditions and other provisions of this Agreement, at the Closing, the Sellers shall grant, sell, assign, transfer and deliver to the Buyer, and the Buyer shall purchase from the Sellers, all right, title and interest in, to and under all of the Sellers' respective assets of every kind, nature and description, whether real, personal or mixed, tangible or intangible, wherever located, whether used in, held for use in or otherwise relating to the Business, other than the Excluded Assets (collectively, the "Purchased Assets"), free and clear of any and all Liens, other than the Permitted Liens.  The Purchased Assets include the following:

(a)    all tangible personal property, including trucks, tractors, trailers, automobiles and other vehicles, forklifts and related equipment, supplies, machinery, equipment, inventories, parts, furniture, computers and related hardware, office furnishings, and tools, in each case, wherever located, including, to the extent in the possession of the Sellers on the Closing Date, the assets set forth on Schedule 2.1(a) attached to this Agreement;

(b)    the parcels of land legally described on Schedule 2.1(b) attached to this Agreement (the "Land Premises"), together with all buildings, improvements and fixtures erected on the Land Premises and all easements and other rights appurtenant thereto (the "Owned Real Property");

(c)    all inventions (whether patentable or unpatentable and whether or not reduced to practice), improvements, patents, patent applications, trademarks, service marks, trade dress, logos, trade names and corporate names and all derivations thereof and all goodwill associated with each of the foregoing; all copyrightable works, all copyrights and applications; all trade secrets and confidential business information (including ideas, research and development, know-how, formulas, compositions, manufacturing and production processes and techniques, technical data, designs, drawings, and specifications); all information regarding any Seller's past, current and prospective customers and suppliers (including any and all lists thereof (including

contact information), purchase and sale history, correspondence, complaints, and any and all other data, reports, and information of any kind kept or maintained by or on behalf of any Seller), pricing and cost information, and business and marketing plans and proposals; all telephone and facsimile numbers and telephone directory listings, all email addresses, all website domains, all computer software (whether owned or licensed), all other proprietary rights, and all copies and tangible embodiments (in whatever form or medium) of any of the foregoing, as applicable (collectively, the "Intellectual Property"), and all associated goodwill, licenses and sublicenses, remedies against infringements, and rights to protection of interests under any Laws;

(d)     the Contracts, to the extent assignable, set forth on Schedule 2.1(d) attached to this Agreement (collectively, the "Assumed Contracts");

(e)     causes of action, choses in action, rights of recovery, rights of setoff and rights of recoupment and all other rights or claims against third parties related to any Purchased Asset;

(f)     to the extent transferable under applicable Law, permits, authorizations, approvals, decisions, zoning orders, franchises, registrations, licenses, filings, certificates, variances or similar rights issued to any of the Sellers and used by or in connection with the Business (collectively, the "Permits"), including the Permits set forth on Schedule 2.1(f) attached to this Agreement;

(g)     rights, to the extent assignable, under any agreements in favor of any Seller or for the benefit of any Seller with current or former employees, contractors or third parties, with respect to non-competition, non-solicitation, or other restrictive covenants, regardless of whether any such Person accepts an offer of employment from the Buyer or continues to perform services for the Buyer; and

(h)     books, records, ledgers, files, documents, correspondence, lists, plans, drawings and specifications, creative materials, advertising and promotional materials, studies, reports, and other printed or written materials, including records related to inventory and maintenance of the Purchased Assets, whether in written or electronic form, other than employment records that may not be transferred pursuant to applicable Law.

2.2     Excluded Assets.   Notwithstanding anything to the contrary contained in this Agreement, the Purchased Assets will not include the following assets of the Sellers (collectively, the "Excluded Assets"), which shall be retained by the Sellers:

(a)     restricted and unrestricted cash and cash equivalents (including all restricted cash held by or for the benefit of the Sellers), cash accounts (including cash accounts serving as collateral for secured debt, letters of credit, insurance policies or programs), marketable securities and certificates of deposit, deposits made with respect to Contracts (including the Assumed Contracts), utility deposits, temporary investments of cash, and all bank accounts and all electronic fund transfer accounts;

(b)     the Accounts Receivable;

(c)     all amounts due to any of the Sellers from any other Person who is an Affiliate of such Seller, including any intercompany accounts and any amounts due from the Seller Equityholder;

(d)     all amounts due to any of the Sellers from any Employee for advances or loans made by such Seller to such Employee;

(e)     any Contract that is not an Assumed Contract;

(f)     the Sellers' corporate minute books, limited liability company record books, Governance Documents and tax records, and any other records which the Sellers are required to retain by Law (provided, however, that the Buyer shall be entitled to receive, at its expense, copies of such portions thereof as the Buyer may reasonably request which are related to the Business);

(g)     personnel records for Employees who are not Transferred Employees;

(h)     any and all of the Sellers' or the Estates' actions, claims, demands, rights, defenses, counterclaims, suits and causes of action, whether known or unknown, in law, equity or otherwise, against any creditor or other third party, including (i) the Avoidance Actions, and (ii) any and all other claims or rights or proceedings of any value whatsoever, whether known or unknown, in law, equity or otherwise, against any third party and the proceeds or benefits thereof, including any and all actions which a trustee, debtor in possession or other appropriate party in interest may assert on behalf of the Debtors or the Estates under Chapter 5 of the Bankruptcy Code, including actions under one or more provisions of Sections 542, 543, 544, 545, 546, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code, and the Sellers' claims or causes of action for professional negligence and director and officer liability, but excluding (x) any claim expressly released in writing by any Seller, and (y) any claim against the Buyer or any Affiliate of the Buyer other than as expressly provided for in this Agreement;

(i)     any insurance policies and all insurance proceeds arising in connection with the ownership or operation of the Purchased Assets or the Business prior to the Closing Date;

(j)     all claims, rights, interests and proceeds with respect to refunds of Taxes for periods ending prior to the Closing Date and all rights to pursue appeals of the same;

(k)     any prepaid expenses (including insurance premiums);

(l)     any personal property of any Employees of the Sellers;

(m)     any Employee Benefit Plan;

(n)     the consideration delivered by the Buyer to the Sellers pursuant to this Agreement;

(o)     any and all rights of the Sellers under this Agreement and the Transaction Documents;

(p)    the proceeds, benefits and other recoveries on account of the foregoing items in subparagraphs (a) through (o); and

(q)    the assets and properties of the Sellers set forth on Schedule 2.2(q) attached to this Agreement.

2.3    Assumed Liabilities.    Subject to the terms, conditions, and other provisions of this Agreement, at and effective as of the Closing, the Buyer shall assume the future payment and performance of (or, if otherwise stated in this Agreement, pay at the Closing) the following Liabilities (collectively, the "Assumed Liabilities"):

(a)    all Liabilities under, arising from or relating to the Assumed Contracts with respect to matters occurring thereunder on or after the Closing Date;

(b)    in the event of a Deere Permitted Assumption as provided in Section 7.4, all Liabilities under, arising from or relating to the Deere Loan Contracts with respect to matters occurring thereunder on or after the Closing Date;

(c)    the Accounts Payable of the Sellers with respect to the New Crops (including those amounts described in Section 3.3(b) and Section 3.3(c));

(d)    all Liabilities agreed to be paid by the Buyer pursuant to Section 3.3 and Section 3.4 of this Agreement; and

Notwithstanding anything to the contrary contained in this Agreement, the Buyer shall be responsible for all Liabilities relating to or arising out of the operation of the Purchased Assets or the conduct of the Business by the Buyer on and after the Closing Date.

2.4    Excluded Liabilities.  Notwithstanding anything to the contrary contained in this Agreement, except for the Assumed Liabilities, the Buyer shall not assume, agree to pay, discharge or satisfy, or otherwise have any responsibility, Liability or obligation for any Liability of the Sellers or any Affiliate of the Sellers (collectively, the "Excluded Liabilities").

## ARTICLE III.
## CONSIDERATION

3.1    Deposit.  As an inducement for the Sellers to enter into this Agreement, the Buyer has previously deposited the Deposit with the Escrow Agent.  The Deposit has been deposited by the Escrow Agent in a non-interest bearing attorney trust account at The Bank of Tampa, pending the Closing or termination of this Agreement.  If the Transactions are consummated in accordance with the terms of this Agreement, the Deposit shall be credited to the Purchase Price.  The Deposit shall be non-refundable to the Buyer, except as otherwise provided in Section 9.2(c) of this Agreement.

3.2    Consideration; Payment of Purchase Price. In consideration for the sale, assignment, and conveyance of the Sellers' right, title, and interest in, to and under the Purchased Assets, the Buyer shall, at the Closing, pay or deliver, to or on behalf of the Sellers, an aggregate amount of consideration equal to _____ 00/100 Dollars ($_____)

(the "Purchase Price") to the Sellers, by wire transfer of immediately available funds to the Title Company, (less the Deposit) at least three (3) Business Days prior to the Closing Date, a payment in cash equal to _____ (the Cash Consideration").

3.3     Closing Costs and Payments.

(a)     Title and Real Estate and Other Costs.  The Buyer shall be solely responsible for and shall pay, on the Closing Date, the cost of (i) the title search and the title premiums for the Owner's Policy of Title Insurance and endorsements thereto to be issued hereunder; (ii) recording fees or title insurance endorsements with respect to clearing public records of items that are not Permitted Liens; (iii) any endorsements to the Owner's Policy of Title Insurance and of any simultaneously issued lender's title policies; (iv) recording fees of the Deed and recording fees for any of the Buyer's financing documents; (v) the cost of the Survey and any inspections or environmental audits conducted by or on behalf of the Buyer; and (vi) all other costs and fees associated with the transfer of the Land Premises.

(b)     Transfer Taxes.  To the extent any Liability exists for any Transfer Taxes, including documentary stamp taxes, imposed in connection with the purchase and sale of the Purchased Assets and the Assumed Liabilities, the Buyer shall pay all such Transfer Taxes on the Closing Date.

(c)     New Crop Expenses.  At the Closing, the Buyer shall reimburse the Sellers for the expenses listed on Schedule 3.3(c) attached to this Agreement and any additional expenses incurred and paid by the Sellers prior to the Closing Date with respect to the New Crops (collectively, the "New Crop Expenses").

(d)     Deere Loan Contracts.  At the Closing, in the event there is not a Deere Permitted Assumption as provided in Section 7.3, the Buyer shall pay the Deere Indebtedness in full (the "Deere Closing Payment"), by wire transfer of immediately available funds to an account of Deere designated by Deere in writing to the Buyer at least three (3) Business Days prior to the Closing Date.

3.4     Prorations.  The following items shall be prorated and paid as set forth below:

(a)     Real Estate and Personal Property Taxes.  The Sellers shall be responsible for the payment of all *ad valorem* real and personal property Taxes, including any general or special assessments levied, with respect to the Purchased Assets for the year 2017 and previous years (to the extent the same are unpaid as of the Closing Date) (the "Sellers' Prior Year Taxes"). *Ad valorem* real and personal property Taxes with respect to the Purchased Assets, inclusive of any general or special assessments levied, which are due and payable for the year of Closing, shall be prorated as of the Closing Date based on the actual current tax bill.  If the Closing takes place before the *ad valorem* real and/or personal property Taxes are fixed for the tax year in which the Closing Date occurs, the proration of the *ad valorem* real and/or personal property Taxes, as applicable, will be based on (i) one hundred percent (100%) of the Sellers' 2017 real estate tax bills (combined taxes and assessments), using the amount(s) due by November 30, 2017, as set forth in the 2017 Manatee County Tax Collector Notices of Ad Valorem Taxes and Non-Ad Valorem Assessments, and (ii) one hundred percent (100%) of the Sellers' 2017 personal property

14

tax bills (combined taxes and assessments), using the amount(s) due by November 30, 2017, as set forth in the 2017 Manatee County Tax Collector Notices of Tangible Personal Property Taxes. Any such prorated amount that is allocated to the Sellers hereunder and the Sellers' Prior Year Taxes shall be paid out of the Cash Consideration received by the Sellers (or the Title Company, as applicable) pursuant to Section 3.2 and the Title Company (on behalf of the Sellers) shall be responsible for, and shall pay, all such charges, assessments and Taxes for all periods prior to the Closing. Any proration pursuant to this Section 3.4(a) shall be considered a final settlement as of the Closing for the 2018 real estate Taxes and the 2018 personal property Taxes, and there shall be no re-proration for real estate Taxes or personal property Taxes post-Closing.

(b)  Utilities. The Sellers will cause all meters for electricity, gas, water, sewer or other utility usage at the Owned Real Property and the Leased Real Property to be read on the day before the Closing Date. The Sellers will pay all charges for such utilities which have accrued prior to the Closing Date. If the utility companies are unable or refuse to read the meters on the day before the Closing Date, all charges for such utilities to the extent unpaid will be prorated and adjusted as of the day before the Closing Date based on the most recent bills, or as the Sellers and the Buyer may otherwise mutually agree. Any such prorated amount that is allocated to the Sellers shall reduce the Cash Consideration (to be paid to the Sellers pursuant to Section 3.2) on the Closing Statement and the Buyer shall be responsible for, and shall pay, all such charges for all periods prior to the Closing. If any prepaid utility deposits of the Sellers are transferred to the Buyer as part of the transfer of utility accounts, then the Cash Consideration shall be increased on the Closing Statement by the amount of such transferred prepaid utility deposits. Notwithstanding the foregoing provisions of this Section 3.4(b), if any such utility charges are applicable to the New Crops, there shall be no proration of such utility charges between the Sellers and the Buyer and such utility charges shall be paid by the Buyer.

(c)  Operating Expenses. All other operating expenses of the Sellers shall be prorated between the Sellers and the Buyer. If the actual amounts of such operating expenses to be prorated are not known as of the Closing Date, the prorations shall be based on the most recent bills related to such operating expenses, or as the Sellers and the Buyer may otherwise mutually agree. Any such prorated amount that is allocated to the Sellers shall reduce the Cash Consideration (to be paid to the Sellers pursuant to Section 3.2) on the Closing Statement and the Buyer shall be responsible for, and shall pay, all such charges for all periods prior to the Closing. Notwithstanding the foregoing provisions of this Section 3.4(c), if any such operating expenses are applicable to the New Crops, there shall be no proration of such operating expenses between the Sellers and the Buyer and such operating expenses shall be paid by the Buyer.

(d)  Special Assessment Liens. Pending special assessment liens as of the Closing Date levied during the year 2018 for the Land Premises shall be prorated in accordance with the provisions of Section 3.4(a).

3.5  Allocation of Purchase Price.

(a)  The Buyer shall prepare and deliver to the Sellers, by no later than thirty (30) days following the Closing Date, a schedule allocating the Purchase Price and the Assumed Liabilities (to the extent included in "amount realized" for U.S. federal income Tax purposes) among the Purchased Assets in accordance with Section 1060 of the Code and the Treasury

Regulations promulgated thereunder (the "Allocation Schedule"). The Sellers shall have the right, for thirty (30) days after such delivery, to review and provide written comments to such draft Allocation Schedule. If the Sellers object to such draft Allocation Schedule within such thirty (30) day period, the Buyer and the Sellers shall seek in good faith for thirty (30) days thereafter to resolve any disagreements between them with respect to such draft Allocation Schedule. If prior to the end of such thirty (30) day period, the Buyer and the Sellers are unable to so agree on the Allocation Schedule, all disputed items shall be subject to resolution in accordance with Section 3.5(b) (the Allocation Schedule finally determined pursuant to this Section 3.5, the "Final Allocation Schedule"). Each Party agrees that it shall (a) be bound by the Final Allocation Schedule for the purposes of determining any Taxes, (b) report for Tax purposes the Transactions consummated pursuant to this Agreement in a manner consistent with the Final Allocation Schedule, (c) not take a position for Tax purposes that is inconsistent with the Final Allocation Schedule on any applicable Tax Return or in any proceeding before any Government Entity having taxing authority or otherwise except with the prior written consent of the other Parties, and (d) file IRS Form 8594 and any other state or federal Tax documentation or forms attendant to or as a consequence of the Transactions, in each case, in accordance with the Final Allocation Schedule. In the event that the Final Allocation Schedule is disputed by any Government Entity having taxing authority, the Party receiving notice of such dispute will promptly notify the other Parties and the Parties will consult in good faith as to how to resolve such dispute in a manner consistent with the Final Allocation Schedule; provided, however, that if the Parties cannot agree on a resolution, any Party shall have the right to settle or compromise such dispute in such manner as that Party determines to be practicable, regardless of whether such settlement is contrary to the Final Allocation Schedule. Any such settlement or compromise by one Party shall not be binding on any other Party. Each Party agrees to provide to each other Party all information required to complete the Allocation Schedule, IRS Form 8594, and any other required forms or filings.

(b)    Any disputes with respect to the Allocation Schedule not resolved between the Parties within the periods specified in Section 3.5(a) above (subject to such extensions thereof as the Parties may agree) will be resolved by an accounting firm acceptable to all of the Parties. The Parties agree to make all records and documents available as such accounting firm may request. The determination by any accounting firm so selected shall be conclusive and binding upon the Parties. The fees and expenses of any such accounting firm under this Section 3.5(b) shall be paid fifty percent (50%) by the Buyer and fifty percent (50%) by the Sellers.

## ARTICLE IV.
## CLOSING

4.1    Closing. Subject to the terms and conditions of this Agreement, the closing of the Transactions (the "Closing") will take place at 10:00 a.m., local time, on _____, 2018, subject to the satisfaction (or valid waiver) of all of the conditions to Closing set forth in Article VIII of this Agreement, or such other date as the Parties may mutually determine. The date on which the Closing actually occurs is referred to herein as the "Closing Date". The Closing shall take place at the offices of Stichter, Riedel, Blain & Postler, P.A., 110 East Madison Street, Suite 200, Tampa, FL 33602, or at such other place or by any other means (including the electronic exchange of signatures) as the Parties may determine. The Closing shall take effect as of 12:01 a.m. prevailing Tampa time on the Closing Date, it being acknowledged and agreed by the Parties that the results of operations of the Sellers and the Business up to the day prior to the Closing Date

shall be for the Sellers' account, and the results of operations of the Purchased Assets will be for the Buyer's account beginning on the Closing Date.

4.2     Closing Deliveries.

(a)     At the Closing, the Sellers shall duly execute and/or deliver, or cause to be duly executed and/or delivered, in a form and substance reasonably acceptable to the Buyer:

(i)     a certificate executed by the President of C&D Fruit as to the satisfaction by C&D Fruit of the conditions in Section 8.1(a) and Section 8.1(b) of this Agreement;

(ii)     a certificate executed by the managing member of Trio Farms as to the satisfaction by Trio Farms of the conditions in Section 8.1(a) and Section 8.1(b) of this Agreement;

(iii)     a certificate executed by the President of North River as to the satisfaction by North River of the conditions in Section 8.1(a) and Section 8.1(b) of this Agreement;

(iv)     a special warranty deed executed by C&D Fruit conveying all of C&D Fruit's right, title and interest in and to the Owned Real Property to the Buyer, subject only to the Permitted Liens, in the form attached to this Agreement as Exhibit D (the "Deed");

(v)     a quitclaim bill of sale from each Seller with respect to all of the Purchased Assets of such Seller, in the forms attached to this Agreement as Exhibit E, Exhibit F and Exhibit G;

(vi)     an assignment and assumption agreement from C&D Fruit and from Trio Farms with respect to all of the Assumed Contracts of C&D Fruit and Trio Farms, in the forms attached to this Agreement as Exhibit H and Exhibit I (the "Assignment Agreements"); provided, however, in the event there is not a Deere Permitted Assumption as provided in Section 7.3, Trio Farms shall not be required to execute and deliver an Assignment Agreement;

(vii)     an assumption agreement from the Sellers providing for the assumption of the Assumed Liabilities by the Buyer, in the form attached to this Agreement as Exhibit J (the "Assumption Agreement");

(viii)     an assignment agreement from the Sellers with respect to all of the Sellers' interest in and to the Intellectual Property, in the form attached to this Agreement as Exhibit K (the "Intellectual Property Assignment");

(ix)     the Closing Statement;

(x)     a certificate from C&D Fruit that C&D Fruit is not a foreign person within the meaning of Section 1445(f)(3) of the Code;

(xi)    customary title affidavits and indemnities, and such other reasonable documents as may be required, to permit issuance of the Owner's Policy of Title Insurance insuring title as to the Land Premises;

(xii)    a certificate of good standing (dated not more than ten (10) days prior to the Closing Date) of each Seller from its jurisdiction of incorporation or organization;

(xiii)    a certificate, dated as of the Closing Date, and signed by the President or Secretary of C&D Fruit, certifying as to (A) the authenticity of the signatures of each officer or other representative of C&D Fruit executing this Agreement and all other Transaction Documents to which it is a party on behalf of C&D Fruit, (B) the resolutions of the board of directors of C&D Fruit authorizing the execution, delivery, and performance of this Agreement and all other Transaction Documents to which it is a party (a copy of which resolutions shall be attached to such certificate), including that such resolutions are true and correct, are in full force and effect, and have not been rescinded, modified, amended or supplemented, and (C) the articles of incorporation and bylaws of C&D Fruit;

(xiv)    a certificate, dated as of the Closing Date, and signed by the managing member of Trio Farms, certifying as to (A) the authenticity of the signatures of each officer or other representative of Trio Farms executing this Agreement and all other Transaction Documents to which it is a party on behalf of Trio Farms, (B) the resolutions of the members of Trio Farms authorizing the execution, delivery, and performance of this Agreement and all other Transaction Documents to which it is a party (a copy of which resolutions shall be attached to such certificate), including that such resolutions are true and correct, are in full force and effect, and have not been rescinded, modified, amended or supplemented, and (C) the articles of organization and operating agreement of Trio Farms;

(xv)    a certificate, dated as of the Closing Date, and signed by the President of North River, certifying as to (A) the authenticity of the signatures of each officer or other representative of North River executing this Agreement and all other Transaction Documents to which it is a party on behalf of North River, (B) the resolutions of the board of directors of North River authorizing the execution, delivery, and performance of this Agreement and all other Transaction Documents to which it is a party (a copy of which resolutions shall be attached to such certificate), including that such resolutions are true and correct, are in full force and effect, and have not been rescinded, modified, amended or supplemented, and (C) the articles of incorporation and bylaws of North River;

(xvi)    certificates of title for all trucks, vehicles and all other titled Purchased Assets;

(xvii)    a certified copy of the Sale Order;

(xviii)    a certified copy of the Confirmation Order;

18

(xix)    in the event there is not a Deere Permitted Assumption as provided in <u>Section 7.3</u>, payoff letters from Deere as to the Deere Indebtedness;

(xx)    Lien release and termination documentation of all Liens on any of the Purchased Assets, other than the Permitted Liens; and

(b)    At the Closing, the Buyer shall duly execute and/or deliver, or cause to be duly executed and/or delivered, in a form and substance reasonably acceptable to the Sellers:

(i)    the Cash Consideration;

(ii)    in the event there is not a Deere Permitted Assumption as provided in <u>Section 7.4</u>, the Deere Closing Payment;

(iii)    the payment for the New Crop Expenses;

(iv)    a certificate executed by the managing member of the Buyer as to the satisfaction by the Buyer of the conditions in <u>Section 8.2(a)</u> and <u>Section 8.2(b)</u> of this Agreement;

(v)    the Assignment Agreements;

(vi)    the Assumption Agreement;

(vii)    the Intellectual Property Assignment;

(viii)    the Closing Statement;

(ix)    a certificate of good standing (dated not more than ten (10) days prior to the Closing Date) of the Buyer from its jurisdiction of organization;

(x)    a certificate, dated as of the Closing Date, and signed by the managing member of the Buyer, certifying as to (A) the authenticity of the signatures of each officer or other representative of the Buyer executing this Agreement and all other Transaction Documents to which it is a party on behalf of the Buyer, (B) the resolutions of the members of the Buyer authorizing the execution, delivery, and performance of this Agreement and all other Transaction Documents to which it is a party (a copy of which resolutions shall be attached to such certificate), including that such resolutions are true and correct, are in full force and effect, and have not been rescinded, modified, amended or supplemented, and (C) the articles of organization and operating agreement of the Buyer;

(xi)    the Survey, which shall be signed, sealed and certified to the Buyer, the Title Agent and the Title Company at or prior to the Closing; and

(xii)    if applicable, the written consent of Deere to the assumption of the Deere Loan Contracts and the Deere Indebtedness by the Buyer and the other documentation to be provided by Deere as provided in <u>Section 7.3</u>.

(c)    At the Closing, each Party shall execute and deliver such other instruments of transfer and/or assignment, certificates, deeds, bills of sale, evidence of filing and/or recording, and other documents as are required pursuant to the terms of this Agreement or applicable Law or are reasonably necessary to effectuate the Transactions.

## ARTICLE V.
## REPRESENTATIONS AND WARRANTIES OF THE SELLERS

Except as expressly set forth in the Disclosure Schedules attached to this Agreement pursuant to this <u>Article V</u> and incorporated by reference herein (the "<u>Sellers' Disclosure Schedules</u>"), as of the Execution Date and as of the Closing Date, each of the Sellers, as applicable, represents and warrants to the Buyer the following:

5.1    <u>Organization; Qualification and Power</u>.

(a)    C&D Fruit is a corporation duly organized, validly existing and in good standing under the Laws of the State of Florida. C&D Fruit has the requisite corporate power and corporate authority to own, operate or lease the properties and assets now owned, operated or leased by it and to carry on the Business as currently conducted by C&D Fruit. C&D Fruit is duly qualified to do business as a foreign entity and is in good standing in each jurisdiction where the character of its properties owned or leased or the nature of its activities makes such qualification necessary, except where the failure to be so qualified or in good standing would not have a Material Adverse Effect.

(b)    Trio Farms is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Florida. Trio Farms has the requisite limited liability company power and limited liability company authority to own, operate or lease the properties and assets now owned, operated or leased by it and to carry on the Business as currently conducted by Trio Farms. Trio Farms is duly qualified to do business as a foreign entity and is in good standing in each jurisdiction where the character of its properties owned or leased or the nature of its activities makes such qualification necessary, except where the failure to be so qualified or in good standing would not have a Material Adverse Effect.

(c)    North River is a corporation duly organized, validly existing and in good standing under the Laws of the State of Florida. North River has the requisite corporate power and corporate authority to own, operate or lease the properties and assets now owned, operated or leased by it and to carry on the Business as currently conducted by North River. North River is duly qualified to do business as a foreign entity and is in good standing in each jurisdiction where the character of its properties owned or leased or the nature of its activities makes such qualification necessary, except where the failure to be so qualified or in good standing would not have a Material Adverse Effect.

5.2    <u>Authorization of Transactions</u>. Each Seller has full legal capacity or entity power and entity authority, as applicable, to enter into and perform such Party's obligations under this Agreement and all other Transaction Documents to which it is a party. Each Seller's board of directors or applicable governing body has duly authorized the execution, delivery and performance of this Agreement and the Transaction Documents to which such Seller is a party. This Agreement

and the Transaction Documents to which each Seller is a party have been, or upon execution thereof by each such Seller, will be, duly executed and delivered by each, and assuming the due authorization, execution and delivery by the other Parties of this Agreement and the Transaction Documents to which each other Party is a party, are, or will be, the legal, valid and binding obligations of each such Seller, and enforceable against each such Seller, in accordance with their respective terms, except as enforceability may be limited by (i) applicable bankruptcy, insolvency, reorganization, liquidation, moratorium and other Laws of general application affecting enforcement of creditors' rights generally, and (ii) Laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

5.3    Noncontravention.  Except as set forth on Schedule 5.3 attached to this Agreement, neither the execution and the delivery of this Agreement and the Transaction Documents to which any Seller is a party nor the consummation of the Transactions: (i) will violate any Law to which any Seller is subject; (ii) will violate any provision of the articles of incorporation, bylaws, operating agreement, or other organizational documents of any Seller; or (iii) require any Seller to give any notice to, make any filing with, or obtain any authorization, consent or approval of any Government Entity in order for the Parties to consummate the Transactions, except to the extent any failure to so comply would not have a Material Adverse Effect.

5.4    Brokers' Fees.  Except as set forth on Schedule 5.4 attached to this Agreement, no investment banker, broker, finder or financial intermediary has been retained by or is authorized to act on behalf of the Sellers or any of their Affiliates, or is entitled to any brokerage fees, finder's fees or commissions based upon arrangements made by or on behalf of the Sellers or any of their Affiliates, in connection with the Transactions; provided, however, that the representations set forth in this Section 5.4 shall not be an admission by the Sellers that any fees or commissions are due to any such investment banker, broker, finder or financial intermediary.

5.5    Title to Purchased Assets.  Each Seller has good and marketable title to, or in the case of leased or licensed assets, valid leasehold interests or licenses to, the Purchased Assets owned, leased or licensed by it, free and clear of all Liens, except for the Liens set forth on Schedule 5.5 attached to this Agreement and the Permitted Liens.  At the Closing, the Sellers will assign and convey to the Buyer title to the Purchased Assets free and clear of all Liens except the Permitted Liens and the Assumed Liabilities.

5.6    Tax Matters.  The Sellers have filed all Tax Returns required to have been filed by the Sellers.  All such Tax Returns were correct and complete in all respects.  All Taxes owed or required to be withheld by any Seller (whether or not shown on any Tax Return) have been paid or withheld.  To the Knowledge of the Sellers, no claim has ever been made that any Seller is or may be subject to taxation by a jurisdiction where it does not file Tax Returns.  No Purchased Assets are subject to any Lien that arose in connection with any failure (or alleged failure) to pay any Tax, except for the Permitted Liens.  No Seller has waived any statute of limitations or agreed to any extension of time with respect to a Tax assessment or deficiency.

5.7    Intellectual Property.

(a)    Schedule 5.7 attached to this Agreement lists all Intellectual Property currently owned by each Seller and used in the operation of the Business.  To the Knowledge of

the Sellers, the applicable Seller owns or has good and valid license to use all Intellectual Property used in the operation of the Business.

(b)    The Sellers have delivered to the Buyer correct and complete copies of all written documentation evidencing ownership and prosecution (if applicable) of each item of Intellectual Property identified on Schedule 5.7. With respect to each item: (i) the applicable Seller possesses all right, title and interest in and to the item, free and clear of any Lien, license or other restriction, except for the Liens set forth on Schedule 5.5 attached to this Agreement and the Permitted Liens; (ii) the item is not subject to any outstanding injunction, judgment, order, decree, ruling or charge; (iii) no Action is pending or, to the Knowledge of the Sellers, is threatened that challenges the legality, validity, enforceability, use or ownership of the item; and (iv) such Seller has never agreed to indemnify any Person for or against any interference, infringement, misappropriation or other conflict with respect to the item.

5.8    Real Property.

(a)    The Owned Real Property constitutes all of the real property owned by the Sellers and used in connection with the operation of the Business. Except as set forth on (i) Schedule 5.8(a) attached to this Agreement and (ii) Schedule B Section I of the Title Commitment (as such Schedule B Section I exists as of _____), C&D Fruit and North River have good and marketable, fee simple absolute title to the Owned Real Property, free and clear of all Liens, except for the Permitted Liens, and C&D Fruit and North River have not leased or otherwise granted to any Person the right to use or occupy the Owned Real Property or any portion thereof, including transfers of mineral rights, which remains in effect. No Seller nor any of its respective Affiliates is a party to any agreement or option to purchase any real property or interest therein relating to, or intended to be used in the operation of, the Business.

(b)    Schedule 5.8(b) attached to this Agreement sets forth a true and complete list of all leases, subleases and other occupancy agreements (written and oral), including all amendments, extensions and other modifications (the "Leases"), for each leasehold or sub-leasehold estate and other rights to use or occupy any land, improvements, or other interest in real property held by each Seller for use in the Business (the "Leased Real Property"). The Sellers have previously delivered to the Buyer true, complete and correct copies of the Leases and, in the case of an oral Lease, a written summary of the material terms thereof.

(c)    The Owned Real Property and the Leased Real Property constitute all of the real property owned, leased, occupied or otherwise utilized in connection with the Business as of the Execution Date. There is no pending or, to the Knowledge of the Sellers, threatened condemnation Action or eminent domain Action affecting any portion of the Owned Real Property or, to the Knowledge of the Sellers, the Leased Real Property.

5.9    Litigation. Except for the Bankruptcy Case, Schedule 5.9 attached to this Agreement is an accurate list of all pending Actions with respect to the Sellers, the Business, and the Purchased Assets.

5.10    <u>Employment Matters</u>.

(a)    <u>Schedule 5.10(a)</u> attached to this Agreement sets forth, as of the Execution Date, the name, title, function, salary or hourly wage, and employment status (whether full or part time), active or on leave (and if on leave, the nature, start date and expected end date of such leave) of each Employee of any Seller (whether employed directly by such Seller or indirectly pursuant to a Contract with a third-party employment services provider).

(b)    No Employee or group of Employees has communicated to any Seller any plans or intention to terminate employment with such Seller, or taken or, to the Knowledge of the Sellers, threatened to take any legal action against such Seller, the Buyer or any of their respective Affiliates in connection with the Transactions or any other matter whatsoever.  No Seller is a party to or bound by any collective bargaining agreement, nor has it experienced any strikes, grievances, claims of unfair labor practices or other collective bargaining disputes.  No Seller has committed any unfair labor practice.  There is not now any, and during the past three (3) years there has been no, organizational effort made or, to the Knowledge of the Sellers, threatened by or on behalf of any labor union with respect to the Employees.

5.11    <u>Employee Benefits</u>.  <u>Schedule 5.11</u> attached to this Agreement lists each Employee Benefit Plan that any Seller (or any member of its "controlled group" as defined in Section 414(b) or (c) of the Code) maintains, contributes to or has any obligation to contribute with respect to any Employee.  All contributions to such Employee Benefit Plans required to be made or accrued will be paid by the applicable Seller before the Closing Date.

5.12    <u>Patriot Act; OFAC Certification</u>.  No Seller, nor the Seller Equityholder, nor the Sellers' respective principals, constituents, investors or Affiliates are in violation of any legal requirements relating to terrorism or money laundering, including Executive Order No. 13224 on Terrorist Financing (effective September 24, 2001) (the "<u>Executive Order</u>") and the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, as amended (the "<u>Patriot Act</u>").  No Seller, nor the Seller Equityholder, nor the Sellers' respective principals, constituents, investors or Affiliates is a "<u>Prohibited Person</u>" which is defined as follows: (a) a person or entity that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order; (b) a person or entity owned or controlled by, or acting for or on behalf of, any person or entity that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order; (c) a person or entity with whom the investor is prohibited from dealing or otherwise engaging in any transaction by any terrorism or money laundering legal requirements, including the Executive Order and the Patriot Act; (d) a person or entity who commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order; (e) a person or entity that is named as a "specially designated national and blocked person" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control; and (f) a person or entity who is affiliated with a person or entity listed above.  No Seller, nor the Seller Equityholder, nor the Sellers' respective principals, constituents, investors or Affiliates will (i) conduct any business or engage in any transaction or dealing with any Prohibited Person, including the making or receiving of any contribution of funds, goods or services to or for the benefit of any Prohibited Person, (ii) deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order, or (iii) engage in or conspire to engage in any transaction that evades or avoids, or has the purposes of evading or

avoiding, or attempts to violate, any of the prohibitions set forth in the Executive Order or the Patriot Act.

## ARTICLE VI.
## REPRESENTATIONS AND WARRANTIES OF THE BUYER

Except as expressly set forth in the Disclosure Schedules attached to this Agreement pursuant to this Article VI and incorporated by reference herein (the "Buyer Disclosure Schedules"), as of the Execution Date and as of the Closing Date, the Buyer represents and warrants to the Sellers the following:

6.1    Organization.  The Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Florida.

6.2    Authorization of Transactions.  The Buyer has full entity power and entity authority to enter into and perform the Buyer's obligations under this Agreement and all other Transaction Documents to which it is a party.  The Buyer's governing body has duly authorized the execution, delivery and performance of this Agreement and the Transaction Documents to which the Buyer is a party.  This Agreement and the Transaction Documents to which the Buyer is a party have been, or upon execution thereof by the Buyer will be, duly executed and delivered by the Buyer and, assuming the due authorization, execution and delivery by the other Parties of this Agreement and the Transaction Documents to which each other Party is a party, are, or will be, the legal, valid and binding obligations of the Buyer and enforceable against the Buyer in accordance with their respective terms, except as enforceability may be limited by (i) applicable bankruptcy, insolvency, reorganization, liquidation, moratorium and other Laws of general application affecting enforcement of creditors' rights generally, and (ii) Laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

6.3    Noncontravention.  Except as set forth on Schedule 6.3 attached to this Agreement, neither the execution and the delivery of this Agreement and the Transaction Documents to which the Buyer is a party nor the consummation of the Transactions: (i) will violate any Law to which the Buyer is subject; (ii) will violate any provision of the articles of organization, operating agreement, or other organizational documents of the Buyer; (iii) will conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice or consent under any agreement, contract, lease, license, instrument or other arrangement to which the Buyer is a party or by which any of its assets is bound; or (iv) require the Buyer to give any notice to, make any filing with, or obtain any authorization, consent or approval of any Government Entity in order for the Parties to consummate the Transactions.

6.4    Brokers' Fees.  Except as set forth on Schedule 6.4 attached to this Agreement, no investment banker, broker, finder or financial intermediary has been retained by or is authorized to act on behalf of the Buyer or any of its Affiliates, or is entitled to any brokerage fees, finder's fees or commissions based upon arrangements made by or on behalf of the Buyer or any of its Affiliates, in connection with the Transactions.

6.5     <u>Regulatory Compliance</u>.  The Buyer is in compliance in all material respects with all applicable Laws and requirements of the Government Entities having jurisdiction over the Buyer and the operations of the Buyer.

6.6     <u>Patriot Act; OFAC Certification</u>.  Neither the Buyer nor the Buyer's respective principals, constituents, investors or Affiliates are in violation of any legal requirements relating to terrorism or money laundering, including the Executive Order and the Patriot Act.  Neither the Buyer nor the Buyer's respective principals, constituents, investors or Affiliates is a "<u>Prohibited Person</u>" as defined in <u>Section 5.21</u> of this Agreement.  Neither the Buyer nor the Buyer's respective principals, constituents, investors or Affiliates will (i) conduct any business or engage in any transaction or dealing with any Prohibited Person, including the making or receiving of any contribution of funds, goods or services to or for the benefit of any Prohibited Person, (ii) deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order, or (iii) engage in or conspire to engage in any transaction that evades or avoids, or has the purposes of evading or avoiding, or attempts to violate, any of the prohibitions set forth in the Executive Order or the Patriot Act.

6.7     <u>No Financing Contingency</u>.  On the Execution Date and on the Closing Date, the Buyer has, and will have, funds necessary to (i) pay the Cash Consideration, (ii) pay any and all fees and expenses required to be paid by the Buyer in connection with the Transactions, and (iii) satisfy all of its other payment obligations payable under this Agreement and any Transaction Documents.

**ARTICLE VII.**
**ADDITIONAL AGREEMENTS**

7.1     <u>Pre-Closing Covenants</u>.  The Parties agree as follows with respect to the period between the Execution Date and the Closing Date:

(a)     Each of the Parties shall use its reasonable best efforts to take all actions and to do all things necessary, proper, or advisable in order to consummate and make effective the Transactions contemplated by this Agreement.

(b)     From the Execution Date until the Closing Date, except as otherwise contemplated by this Agreement, authorized by an order of the Bankruptcy Court or to the extent the Buyer shall otherwise consent in writing, and subject to the requirements of the Bankruptcy Cases, the Debtors shall: (i) conduct the Business in the Ordinary Course, (ii) make no transfers of any of the Debtors' Purchased Assets, and (iii) use commercially reasonable efforts to maintain and preserve intact the organization and advantageous business relationships of the Business.

(c)     The Sellers shall permit Representatives of the Buyer to have reasonable access, at all reasonable times, upon reasonable notice, and in a manner so as not to interfere with the normal business operations of the Sellers, to all premises, properties, personnel, books, records, and Contracts of or pertaining to the Sellers, and shall furnish the Representatives of the Buyer with all information of or pertaining to the Sellers as they may reasonably request.

(d)     Each Party shall give prompt written notice to the other Parties of any event, occurrence, change, effect, development, circumstance, or condition hereafter arising or

25

discovered, which would or would be reasonably expected to cause a breach of any of the representations and warranties set forth in Article V or Article VI, as the case may be. No such notice shall be deemed to prevent or cure any misrepresentation, breach of warranty or breach of covenant, or have any effect for the purpose of determining the satisfaction of the conditions to Closing set forth in Article VIII.

7.2     Employee Matters.

(a)     Prior to the Closing, the Buyer shall identify those Employees to whom the Buyer desires to offer employment. The terms of such employment shall be as the Buyer shall determine in its sole discretion. Each Seller shall use its commercially reasonable efforts to assist the Buyer in (i) the identification of Employees the Buyer may desire to hire, (ii) facilitating meetings between the Buyer and such Employees, and (iii) transferring any rights of the applicable Seller under any contract with any third party employer of such Employees to the extent necessary or desirable for the Buyer to hire such Employees to the extent the Buyer elects to do so. Prior to the Closing, the Buyer will provide the Sellers with a list of the Employees to whom the Buyer has made an offer of employment that has been accepted to be effective upon the Closing (the "Transferred Employees"). Effective as of the Closing, the Sellers agree to terminate the employment of all of the Transferred Employees.

(b)     The Sellers will pay, in the Ordinary Course of their business payroll practices, all obligations owed to Employees through the day prior to the Closing Date, including all salary, wage, bonus, paid time off, benefits, overtime, taxes, and other compensation or other amounts payable to or with respect to the Employees. The Sellers will be solely liable for all workers' compensation claims made by any of the Transferred Employees based on events or circumstances first occurring prior to the Closing, and the Buyer will be solely liable for all such claims made by any of the Transferred Employees based on events or circumstances first occurring after the Closing.

(c)     As of 11:59 p.m. on the day before the Closing Date, all Transferred Employees shall cease participation in all Employee Benefit Plans of the Sellers. Beginning at 12:01 a.m. on the Closing Date, the Buyer will provide employee benefit coverage for all Transferred Employees under new or existing plans sponsored by the Buyer. The Sellers will remain solely liable and the Buyer will not assume or otherwise have any Liabilities for any contributions or benefits due with respect to any period prior to the Closing under any of the Sellers' Employee Benefit Plans.

(d)     In respect of notices and payments relating to events occurring prior to the Closing or as a result of the Transactions, the Buyer shall not be responsible for nor assume any Liability of any Seller for any payments, fines, and penalties, if any, under the Worker Adjustment and Retraining Notification Act, the Florida Worker Adjustment and Retraining Act and any other applicable state or local mini-WARN acts (collectively, the "WARN Acts") in connection with the Transactions (including any such Liability for failure to furnish required notices under the WARN Acts).

(e)     Nothing in this Section 7.2, whether express or implied, confers upon any Employee or any other Person any rights or remedies, including any right to employment or recall,

or any right to claim any particular compensation, benefit or aggregation of benefits, of any kind or nature whatsoever.

7.3     Assumption of Deere Indebtedness and/or Deere Loan Contracts.  Following the execution of this Agreement and until the Closing, the Buyer shall be permitted to negotiate and seek to obtain the consent of Deere to an assumption of the Deere Indebtedness and/or the Deere Loan Contracts by the Buyer; provided, however, that any such assumption shall require that Deere (i) release the Sellers, and their respective Affiliates from all of their obligations under the Deere Indebtedness and the Deere Loan Contracts, including any guarantees of the Deere Loan Contracts, and (ii) terminate and/or release any and all Liens granted to Deere pursuant to the Deere Loan Contracts (a "Deere Permitted Assumption").

7.4     Assignment of Contracts, Rights, Etc.  Notwithstanding anything contained in this Agreement to the contrary, this Agreement shall not constitute an agreement or attempted agreement to transfer, sublease or assign any Contract, or any Action or right with respect to any benefit arising thereunder or resulting therefrom, or any Permit, if an attempted transfer, sublease or assignment thereof, without the required consent of any other party thereto, would constitute a breach thereof or in any way affect the rights of the Buyer thereunder.  To the extent not obtained on or prior to the Closing Date, the Sellers and the Buyer shall use commercially reasonable best efforts to obtain the consent of any such third party to any of the foregoing to the transfer or assignment thereof to the Buyer in all cases in which such consent is required for such transfer or assignment.  If such consent is not obtained, then the asset for which such consent could not be obtained shall be deemed to be an Excluded Asset hereunder, and the Parties shall cooperate in any arrangements necessary or desirable to provide for the Buyer the benefits thereunder, including enforcement by the Sellers for the benefit of Buyer of any and all rights of the Sellers thereunder against the other party thereto and the accrual to the Buyer of all economic rights thereunder.

7.5     Publicity; Confidentiality.  A Party may only issue a press release or make a public statement concerning this Agreement and the Transactions if such press release or public statement is made in form and substance, and at a time, to which all other Parties have consented after good faith consultation.  Following the Closing, no Party shall unreasonably withhold its consent regarding the general announcement of the purchase and sale contemplated hereunder.  Otherwise, no Party shall make any public disclosure concerning this Agreement, the Transactions, or the existence of and/or particulars of any negotiations related hereto, including the terms, conditions, consideration to be paid or other facts related to this Agreement, except to the extent that public disclosure is required by applicable Law or is otherwise made to a Government Entity, in which case, to the extent practicable, the Parties will use their reasonable best efforts to reach mutual agreement on disclosure language prior to making such disclosure.  Each Party will, and will cause its Representatives to, maintain in confidence all written information obtained in confidence from the other Parties in connection with this Agreement or the Transactions (the "Confidential Information"), unless the use or disclosure of such Confidential Information is reasonably necessary in connection with (a) obtaining any approval; (b) the negotiation of the terms of this Agreement or the Transactions; or (c) a valid court order.  Confidential Information shall not include information that is or becomes publicly known through no wrongful act of any Party.  Notwithstanding the foregoing provisions, any non-disclosure or confidentiality agreement previously executed by the Parties shall remain in full force and effect until the Closing.

7.6     <u>Preservation and Access to Records After Closing</u>.  After the Closing, the Sellers and the Buyer shall each keep and preserve in their original form all records of the Business existing as of the Closing, and which constitute a part of the Excluded Assets or the Purchased Assets.  For purposes of this Agreement, the term "<u>records</u>" includes all documents, electronic data and other compilations of information in any form.  The Buyer will allow the Sellers and their Representatives access to the records transferred to the Buyer at the Closing, including reasonable access to workspace at the Owned Real Property, consistent with the provisions of <u>Section 7.1(d)</u>.

7.7     <u>Cooperation on Tax Matters</u>.  Following the Closing, the Parties shall reasonably cooperate with each other and shall make available to one another, as reasonably requested and at the expense of the requesting party, and to any taxing authority, any information which may be relevant to determining the amounts payable under this Agreement, and shall preserve all such information, records and documents (to the extent a part of the Purchased Assets delivered to the Buyer at the Closing) at least until the expiration of any applicable statute of limitations and extensions thereof.  The Sellers shall be responsible for filing any and all Tax Returns and Tax documentation relating to the Business or the Sellers' operations relating to periods prior to the Closing Date.

7.8     <u>Tax Effects</u>.  None of the Parties (nor such Parties' counsel or accountants) has made or is making any representations to any other Party (nor such Party's counsel or accountants) concerning any of the Tax effects of the Transactions provided for in this Agreement as each Party represents that each has obtained, or may obtain, independent Tax advice with respect thereto and upon which it, if so obtained, has solely relied.

7.9     <u>Misdirected Payments</u>.  The Parties covenant and agree to promptly remit to the other Party any payments received, which payments are on or in respect of accounts or notes receivable owned by (or are otherwise payable to) such other Party.

7.10     <u>Change of Corporate Names</u>.  Within ten (10) Business Days after the Closing, the Sellers will change their corporate names, and complete all filings necessary to make such a change, to a name that does not contain the words "C&D Fruit and Vegetable", "Trio Farms", "North River Properties" or any derivation thereof.  The Sellers will further take all steps and make all filings necessary to cancel or assign, as directed by the Buyer, their trade names and doing business as designations, including "C&D Fruit and Vegetable", "Trio Farms", "North River Properties" and any derivation thereof.

7.11     <u>As-Is Where-Is Sale; Sellers' Disclaimers</u>.  IT IS EXPRESSLY UNDERSTOOD AND AGREED BY THE BUYER THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES OF THE SELLERS SET FORTH IN <u>ARTICLE V</u> OF THIS AGREEMENT, THE PURCHASED ASSETS ARE BEING SOLD BY THE SELLERS AND PURCHASED BY THE BUYER IN THEIR THEN PRESENT CONDITION AT THE CLOSING "AS IS" AND "WHERE IS", "WITHOUT RECOURSE", AND WITH ALL FAULTS AND DEFECTS, LATENT OR OTHERWISE, AND THAT THE SELLERS ARE MAKING NO ADDITIONAL REPRESENTATIONS OR WARRANTIES TO THE BUYER OF ANY KIND, EITHER EXPRESS OR IMPLIED, BY OPERATION OF LAW OR OTHERWISE, INCLUDING AS TO (A) THE VALUE, NATURE, LOCATION QUALITY, OR CONDITION OF THE PURCHASED ASSETS, INCLUDING THE WATER, SOIL, AND GEOLOGY AS TO THE

LAND PREMISES OR THE LEASED REAL PROPERTY; (B) THE INCOME TO BE DERIVED FROM THE BUSINESS OR THE PURCHASED ASSETS OR THE OPERATIONS OR RESULTS OF OPERATIONS OR ECONOMIC FORECASTS OR PROJECTIONS CONCERNING EARNINGS OR PROFITS; (C) THE SUITABILITY OF THE PURCHASED ASSETS FOR ANY AND ALL ACTIVITIES AND USES THAT THE BUYER MAY CONDUCT AT THE OWNED REAL PROPERTY OR THE LEASED REAL PROPERTY; (D) THE COMPLIANCE OF OR BY THE PURCHASED ASSETS OR THE BUSINESS WITH ANY LAWS, RULES, ORDINANCES, OR REGULATIONS OF ANY APPLICABLE GOVERNMENT ENTITY; (E) THE HABITABILITY, SUITABILITY, MERCHANTABILITY, MARKETABILITY, PROFITABILITY, OR FITNESS FOR A PARTICULAR PURPOSE OR ANY PURPOSE OF THE PURCHASED ASSETS OR THE LEASED REAL PROPERTY; (F) THE MANNER OR QUALITY OF THE CONSTRUCTION OR MATERIALS, IF ANY, INCORPORATED INTO THE PURCHASED ASSETS OR THE LEASED REAL PROPERTY; (G) THE PHYSICAL CONDITION OF THE PURCHASED ASSETS OR THE LEASED REAL PROPERTY OR THE MANNER, QUALITY, STATE OF REPAIR, OR LACK OF REPAIR OF THE PURCHASED ASSETS OR THE LEASED REAL PROPERTY; (H) COMPLIANCE WITH ANY ENVIRONMENTAL LAWS OR LAND USE LAWS, RULES, REGULATIONS, ORDERS, OR REQUIREMENTS, INCLUDING THE EXISTENCE IN OR ON THE OWNED REAL PROPERTY OR THE LEASED REAL PROPERTY OF HAZARDOUS MATERIALS; (I) THE ENFORCEABILITY OF ANY ASSUMED CONTRACT OR RIGHT OR PERMIT ASSIGNED HEREUNDER; OR (J) ANY OTHER MATTER WITH RESPECT TO THE PURCHASED ASSETS OR THE LEASED REAL PROPERTY. THE BUYER ACKNOWLEDGES THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES OF THE SELLERS SET FORTH IN ARTICLE V OF THIS AGREEMENT, IT IS FULLY RELYING ON THE BUYER'S (OR THE BUYER'S REPRESENTATIVES') INSPECTIONS OF THE PURCHASED ASSETS AND THE LEASED REAL PROPERTY AND NOT UPON ANY STATEMENT (ORAL OR WRITTEN) WHICH MAY HAVE BEEN MADE OR MAY BE MADE (OR PURPORTEDLY MADE) BY THE SELLERS OR ANY OF THEIR REPRESENTATIVES. THE BUYER ACKNOWLEDGES THAT THE BUYER HAS (OR THE BUYER'S REPRESENTATIVES HAVE) THOROUGHLY INSPECTED AND EXAMINED THE PURCHASED ASSETS AND THE LEASED REAL PROPERTY TO THE EXTENT DEEMED NECESSARY BY THE BUYER IN ORDER TO ENABLE THE BUYER TO EVALUATE THE CONDITION OF THE PURCHASED ASSETS AND THE LEASED REAL PROPERTY AND ALL OTHER ASPECTS OF THE PURCHASED ASSETS OR THE LEASED REAL PROPERTY, AND THE BUYER ACKNOWLEDGES THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES OF THE SELLERS SET FORTH IN ARTICLE V OF THIS AGREEMENT, THE BUYER IS RELYING SOLELY UPON ITS OWN (OR ITS REPRESENTATIVES') INSPECTION, EXAMINATION AND EVALUATION OF THE PURCHASED ASSETS OR THE LEASED REAL PROPERTY AND THEIR CONDITION. THE BUYER ACKNOWLEDGES THAT ANY CONDITION OF THE PURCHASED ASSETS OR THE LEASED REAL PROPERTY THAT THE BUYER DISCOVERS OR DESIRES TO CORRECT OR IMPROVE PRIOR TO OR AFTER THE CLOSING SHALL BE AT THE BUYER'S SOLE EXPENSE.

THE BUYER HEREBY ACKNOWLEDGES THAT THE SELLERS WOULD NOT AGREE TO SELL THE PURCHASED ASSETS ON THE TERMS AND CONDITIONS THAT

ARE SET FORTH IN THIS AGREEMENT IF THE BUYER DID NOT AGREE TO EACH AND EVERY PROVISION IN THIS <u>SECTION 7.11</u>.

THE PROVISIONS OF THIS <u>SECTION 7.11</u> SHALL SURVIVE THE EXPIRATION OR THE TERMINATION OF THIS AGREEMENT OR THE CLOSING (AS APPLICABLE).

## ARTICLE VIII.
## CONDITIONS PRECEDENT

8.1    <u>Conditions to the Obligations of the Buyer</u>.  The obligations of the Buyer to effect the Transactions are subject to the satisfaction at or prior to the Closing of the following conditions, unless waived in writing by the Buyer:

(a)    except for those representations and warranties which are made as of a particular date, the representations and warranties of the Sellers set forth in <u>Article V</u> of this Agreement shall be true and correct in all material respects as of the Execution Date and as of the Closing Date as if made at and as of the Closing Date (except with respect to those representations and warranties which are qualified as to materiality, which shall be true and correct in all respects as of the Closing Date).  The representations and warranties of the Sellers set forth in <u>Article V</u> of this Agreement which are made as of a particular date shall be true and correct in all material respects as of such specific date;

(b)    each of the Sellers shall have performed in all material respects all obligations required to be performed by it under this Agreement at or prior to the Closing;

(c)    the Sellers shall have executed, as applicable, and delivered to the Buyer all of the documents and other items required to be delivered by them at the Closing pursuant to <u>Section 4.2(a)</u> and <u>Section 4.2(b)</u> of this Agreement;

(d)    no Action shall be pending or threatened before any Government Entity that seeks to or does, and no Law shall be in effect that will, prevent consummation of any of the Transactions;

(e)    the Court Approval shall have been obtained and be in full force and effect and the Sale Order and the Confirmation Order shall both have become Final Orders;

(f)    the Buyer shall have been assigned (or shall have received assurances reasonably satisfactory to the Buyer that it will be assigned) the Leases;

(g)    the Sellers shall have satisfied or caused to be satisfied all applicable requirements set forth on Schedule B Section I of the Title Commitment so that the Title Company through the Title Agent will issue to the Buyer, promptly after the Closing, the Owner's Policy of Title Insurance; and

(h)    no portion of the Owned Real Property or the Leased Real Property shall have been (i) destroyed by fire, windstorm or other casualty or (ii) condemned or sold under threat of condemnation, or be the subject of a condemnation proceeding.

8.2     Conditions to the Obligations of the Sellers.  The obligations of the Sellers to effect the Transactions are subject to the satisfaction at or prior to the Closing of the following conditions, unless waived in writing by the Sellers:

(a)     except for those representations and warranties which are made as of a particular date, the representations and warranties of the Buyer set forth in Article VI of this Agreement shall be true and correct in all material respects as of the Execution Date and as of the Closing Date as if made at and as of the Closing Date (except with respect to those representations and warranties which are qualified as to materiality, which shall be true and correct in all respects as of the Closing Date).  The representations and warranties of the Buyer set forth in Article VI of this Agreement which are made as of a particular date shall be true and correct in all material respects as of such specific date;

(b)     the Buyer shall have performed in all material respects all obligations required to be performed by it under this Agreement at or prior to the Closing;

(c)     the Buyer shall have executed, as applicable, and delivered to the Sellers all of the documents and other items required to be delivered by the Buyer at the Closing pursuant to Sections 4.2(b) of this Agreement;

(d)     no Action shall be pending or threatened before any Government Entity that seeks to or does, and no Law shall be in effect that will, prevent consummation of any of the Transactions; and

(e)     the Court Approval shall have been obtained and be in full force and effect and the Sale Order and the Confirmation Order shall both have become Final Orders.

## ARTICLE IX.
## TERMINATION AND SPECIFIC PERFORMANCE

9.1     Events of Termination.  This Agreement may be terminated and the Transactions contemplated hereby may be abandoned at any time prior to the Closing:

(a)     by mutual written consent of the Parties;

(b)     by any Party, if the Closing Date shall not have occurred (or the conditions precedent to Closing set forth in Article VIII of this Agreement have not been satisfied or waived) by _____, 2018 (the "Outside Closing Date"); provided, however, that the right to terminate this Agreement under this Section 9.1(b) shall not be available to any Party whose failure to fulfill any obligation under this Agreement shall be the cause of the failure of the Closing Date to occur on or before the Outside Closing Date;

(c)     by the Sellers, if there has been a material breach of any covenant or condition or any representation or warranty of the Buyer and the Sellers have notified the Buyer of such breach in writing, and the breach has not been cured (if capable of being cured) within ten (10) days after delivery of such notice (and if not capable of being cured, immediately);

(d)    by the Buyer, if there has been a material breach of any covenant or condition or any representation or warranty of the Sellers and the Buyer has notified the Sellers of such breach in writing, and the breach has not been cured (if capable of being cured) within ten (10) days after delivery of such notice (and if not capable of being cured, immediately); or

(e)    by any Party, if there shall be any Law of any Government Entity that makes consummation of the Transactions illegal or otherwise prohibited or if any judgment, injunction, order or decree of any Government Entity prohibiting the Transactions is entered and such judgment, injunction, order or decree shall have become final and non-appealable.

9.2    <u>Effect of Termination</u>.

(a)    In the event that this Agreement shall be terminated pursuant to <u>Section 9.1</u>, all further obligations of the Parties under this Agreement shall terminate without further Liability of any Party to any other Party hereunder except for those provisions that expressly survive the termination of this Agreement; <u>provided</u>, <u>however</u>, that no Party shall be released from Liability hereunder if this Agreement is terminated and the Transactions abandoned by reason of (i) the failure of such Party to have performed its obligations hereunder, or (ii) any knowing misrepresentation made by such Party of any matter set forth herein.

(b)    In the event that this Agreement is terminated pursuant to <u>Section 9.1(c)</u> (in the event that all conditions precedent to Closing set forth in <u>Article VIII</u> of this Agreement have been satisfied or waived and the Buyer does not close the Transactions), the Escrow Agent shall release to the Debtors the entire Deposit within five (5) days of receipt of written notice of termination, as liquidated damages, in complete satisfaction of any and all rights, remedies, claims and causes of action of the Sellers arising in and out of any termination of this Agreement except as otherwise provided in <u>Section 9.3</u> of this Agreement.

(c)    In the event that this Agreement is terminated pursuant to <u>Section 9.1(a)</u>, (in the event that all conditions precedent to Closing set forth in <u>Article VIII</u> of this Agreement have been satisfied or waived and the Sellers do not close the Transactions), or <u>9.1(e)</u>, then the Sellers shall, within five (5) days of receipt of written notice of termination, direct the Escrow Agent to release the entire Deposit to the Buyer, in complete satisfaction of any and all rights, remedies, claims and causes of action of the Buyer arising in and out of any termination of this Agreement except as otherwise provided in <u>Section 9.3</u> of this Agreement.

9.3    <u>Specific Performance</u>. Each of the Parties acknowledges and agrees that the other Party would be damaged irreparably in the event any of the provisions of this Agreement are not performed in accordance with their specific terms or otherwise are breached; it is and will continue to be difficult to ascertain the nature, scope and extent of such harm; and a remedy at law for such failure or breach will be inadequate. Accordingly, each of the Parties agrees that the other Party is entitled to specific enforcement and/or an injunction (including a temporary restraining order, preliminary injunction and/or or permanent injunctive relief) to prevent breaches of the provisions of this Agreement and to enforce specifically this Agreement in any action instituted in any court

of the United States or any state having jurisdiction over the Parties and the matter in addition to any other remedy to which it may be entitled, at law or in equity.

**ARTICLE X.**
**MISCELLANEOUS**

10.1    Further Assurances. Each of the Parties hereby covenants that, from time to time after the Closing Date, at any other Party's request and without further consideration, it will do, execute, acknowledge and deliver, or cause to be done, executed, acknowledged and delivered, all such further acts, conveyances, transfers, assignments, powers of attorney and assurances as reasonably may be required more effectively to convey, transfer to and vest in the Buyer, and to put the Buyer in possession of, any of the Purchased Assets transferred or assigned hereunder and otherwise to carry out the purposes of this Agreement; provided, however, that, except as expressly set forth in this Agreement or any other Transaction Document, no Party shall be required to make any material monetary expenditures, commence or participate in any Action before any Government Entity, or offer or grant any material accommodation (financial or otherwise) to any Person in connection with the obligations described in this Section 10.1.

10.2    Legal Fees and Costs.

(a)    Except as otherwise provided in this Agreement, each Party hereto shall bear and be responsible for any and all fees, costs and expenses incurred by such Party (including all fees and expenses of its Representatives) in connection with the negotiation and consummation of the transactions contemplated by this Agreement, including any and all agreements entered into before and contemporaneous with this Agreement.

(b)    In the event a Party elects to incur legal expenses to enforce or interpret any provision of this Agreement by judicial proceedings, the prevailing Party will be entitled to recover such legal expenses, including reasonable attorneys' fees, costs, and necessary disbursements at all court levels, in addition to any other relief to which such Party shall be entitled to hereunder.

10.3    Governing Law. The Parties agree that this Agreement shall be governed by and construed in accordance with the Laws of the State of Florida without regard to conflict of Laws principles.

10.4    Binding Effect; Assignment. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns. No Party may assign this Agreement without the prior written consent of the other Parties, except that the Buyer may assign all of its rights and obligations under this Agreement to an Affiliate of the Buyer.

10.5    Waiver of Breach. The waiver by any Party of a breach or violation of any provision of this Agreement shall not operate as, or be construed to constitute, a waiver of any subsequent breach of the same or any other provision hereof. This Agreement may only be amended, or rights hereunder waived, by agreement in writing by the Party to be charged.

10.6    Notice. Any notice, request, demand, waiver, consent, approval, or other communication (collectively, a "Communication") that is required or permitted to be given to any Party under this Agreement will be valid only if it is in writing (whether or not this Agreement

33

expressly provides for it to be in writing) and given to that Party by electronic mail transmission, facsimile transmission, hand delivery, overnight mail, or first-class, postage prepaid, United States mail at the mailing address or electronic mail address or facsimile number set forth below or to any other mailing address or electronic mail address or facsimile number as a Party designates by written notice given in the manner provided in this <u>Section 10.6</u>:

      (a)    If to the Sellers:

> C&D Fruit and Vegetable Co., Inc.
> Trio Farms, L.L.C.
> O'Brien Family Farms, LLC
> P.O. Box 110598
> Bradenton, Florida 34211
> Facsimile No.: (941) 744-9191
> Attention: Thomas Martin O'Brien
> Email: <u>tomob@c-dfruit.com</u>

> With a copy to:

>> Stichter, Riedel, Blain & Postler, P.A.
>> 110 East Madison Street, Suite 200
>> Tampa, Florida 33602
>> Attention: Charles A. Postler, Esq.
>> Facsimile No.: (813) 229-1811
>> Email: cpostler@srbp.com

      (b)    If to the Buyer:

> With a copy to:

A Communication under this Agreement will be effective and deemed to have been given (i) one (1) Business Day after being sent by hand delivery, electronic mail transmission, facsimile transmission or overnight mail, with confirmation of receipt, or (ii) five (5) Business Days following the date mailed when mailed by first-class, postage prepaid, United States mail. Each Party promptly shall notify the other Party of any change in its mailing address, electronic mail address, or facsimile number for Communications.  The delivery to a Party's legal counsel of a copy of a Communication will not constitute delivery of the Communication to the Party, unless so confirmed in writing by the Party's counsel.

      10.7    <u>Severability</u>.  In the event any provision of this Agreement is held to be invalid, illegal or unenforceable for any reason and in any respect, such invalidity, illegality, or unenforceability shall in no event affect, prejudice, or disturb the validity of the remainder of this

34

Agreement, which shall be and remain in full force and effect, enforceable in accordance with its terms.

10.8    Gender and Number.  Whenever the context of this Agreement requires, the gender of all words herein shall include the masculine, feminine, and neuter, and the number of all words herein shall include the singular and plural.

10.9    Divisions and Headings.  The divisions of this Agreement into articles, sections and subsections and the use of captions and headings in connection therewith are solely for convenience and shall have no legal effect in construing the provisions of this Agreement.

10.10    Third-Party Beneficiaries.    Except as otherwise expressly provided in this Agreement, the terms and provisions of this Agreement are intended solely for the benefit of the Parties and their respective permitted successors or assigns, and it is not the intention of the Parties to confer, and this Agreement shall not confer, third-party beneficiary rights upon any other Person.

10.11    Force Majeure.  Whenever a period of time is prescribed herein for action to be taken by a Party, such Party shall not be liable or responsible for, and there shall be excluded from the computation for any period of time, any delays due to strikes, riots, acts of God, shortages of labor or materials, war, Laws or any other cause of any kind whatsoever which is beyond the reasonable control of such Party.

10.12    Entire Agreement; Amendment.  This Agreement (together with all Schedules and Exhibits attached hereto and certificates and documents to be delivered in connection herewith) supersedes all previous contracts or understandings, including any offers, letters of intent, proposals or letters of understanding, and constitutes the entire agreement of whatsoever kind or nature existing between or among the Parties respecting the within subject matter, and no Party shall be entitled to benefits other than those specified herein.  As between or among the Parties, no oral statements or prior written material not specifically incorporated herein shall be of any force and effect.  The Parties specifically acknowledge that in entering into and executing this Agreement, the Parties rely solely upon the representations and agreements contained in this Agreement and any certificates and other documents being executed and delivered in connection herewith.  No changes in or amendments or additions to this Agreement shall be recognized unless and until made in writing and signed by all Parties hereto.  The Schedules and Exhibits hereto constitute an integral and material part of this Agreement, are incorporated herein by reference, and shall be considered part of this Agreement for all purposes.

10.13    WAIVER OF JURY TRIAL.    EACH PARTY HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES THE RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY LEGAL PROCEEDING BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, ANY OF THE OBLIGATIONS HEREUNDER, OR ANY OTHER AGREEMENT EXECUTED OR CONTEMPLATED TO BE EXECUTED IN CONJUNCTION WITH THIS AGREEMENT OR TRANSACTION.

10.14    SUBMISSION TO JURISDICTION. EACH PART IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE EXLUSIVE JURISDICTION OF THE BANKRUPTCY COURT AND ANY APPELLATE COURT ARISING THEREFROM, IN ANY

ACTION OR PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT, THE TRANSACTIONS OR ANY OF THE TRANSACTION DOCUMENTS ENTERED INTO IN CONNECTION HEREWITH OR FOR THE RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDTIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING SHALL BE HEARD AND DETERMINED IN SUCH COURTS. EACH OF THE PARTIES AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND BINDING ON SUCH PARTY.

10.15    <u>Execution in Counterparts</u>.  For the convenience of the Parties, this Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same document.  Signature and acknowledgement pages may be detached from the counterparts and attached to a single copy of this Agreement to physically form one document.  Facsimile or email transmissions of any executed original and/or retransmission of any executed facsimile or email transmission shall be deemed to be the same as the delivery of an executed original.  At the request of any Party hereto, the other Parties hereto shall confirm facsimile or email transmissions by executing duplicate original documents and delivering the same to the requesting Party or Parties.

10.16    <u>No Strict Construction</u>.    The Parties hereto have participated jointly in the negotiation and drafting of this Agreement and the Transaction Documents.  Accordingly, in the event an ambiguity or question of intent or interpretation arises, this Agreement and the Transaction Documents shall be construed as if drafted jointly by the Parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any Party hereto by virtue of the authorship of any provisions of this Agreement and the Transaction Documents.

10.17    <u>Recitals</u>.  The Parties agree that the Recitals set forth above are true and correct in all respects.

*[Signatures on Following Pages]*

IN WITNESS WHEREOF, this Agreement has been executed and delivered as of the date and year first above written by a duly authorized officer or representative of each Party hereto or in an individual capacity, as the case may be.

**SELLERS:**

**Witnesses:**                                    **C&D FRUIT AND VEGETABLE CO., INC.**

_____          By: _____
Print Name: _____          Name:  Thomas Martin O'Brien
_____          Title:   President
Print Name _____


**TRIO FARMS, L.L.C.**

_____          By: _____
Print Name: _____          Name:  Thomas Martin O'Brien
_____          Title:   Managing Member

_____
Print Name: _____


**NORTH RIVER PROPERTIES MANAGEMENT, INC.**

_____          By: _____
Print Name: _____          Name:  Thomas Martin O'Brien
_____          Title:   President

_____
Print Name: _____

**BUYER:**

Print Name: _____

By: _____
Name: _____
Title: _____

Print Name: _____

## **Index to Exhibits**

Exhibit A − Form of Sale Order
Exhibit B − Survey of the Owned Real Property
Exhibit C − Title Commitment
Exhibit D − Form of Special Warranty Deed
Exhibit E − Form of C&D Fruit Bill of Sale
Exhibit F − Form of Trio Farms Bill of Sale
Exhibit G − Form of North River Bill of Sale
Exhibit H − Form of C&D Fruit Assignment Agreement
Exhibit I − Form of Trio Farms Assignment Agreement
Exhibit J − Form of Assumption Agreement
Exhibit K − Form of Intellectual Property Assignment

## **Exhibit A**

Form of Sale Order

(See Attached Document)

## **Exhibit B**

Survey of the Owned Real Property

(See Attached Document)

## **Exhibit C**

Title Commitment


(See Attached Document)

**<u>Exhibit D</u>**

Form of Special Warranty Deed


(See Attached Document)

## **Exhibit E**

Form of C&D Fruit Bill of Sale


(See Attached Document)

## **Exhibit F**

Form of Trio Farms Bill of Sale


(See Attached)

## **Exhibit G**

Form of North River Bill of Sale

(See Attached)

**<u>Exhibit H</u>**

Form of C&D Fruit Assignment Agreement


(See Attached Document)

## **Exhibit I**

Form of Trio Farms Assignment Agreement


(See Attached Document)

**<u>Exhibit J</u>**

Form of Assumption Agreement


(See Attached Document)

**Exhibit K**

Form of Intellectual Property Assignment


(See Attached Document)

# SCHEDULES

## **Schedules**

Schedule 1.1(a)        Deere Loan Contracts
Schedule 2.1(a)        Tangible Personal Property
Schedule 2.1(b)        Legal Description of Land Premises
Schedule 2.1(d)        Assumed Contracts
Schedule 2.1(f)        Permits
Schedule 2.2(q)        Excluded Assets
Schedule 3.3(c)        New Crop Expenses
Schedule 5.3           Noncontravention
Schedule 5.4           Brokers' Fees
Schedule 5.5           Liens
Schedule 5.7           Intellectual Property
Schedule 5.8(a)        Real Property Liens
Schedule 5.8(b)        Leased Real Property
Schedule 5.9           Litigation
Schedule 5.10(a)       Employees
Schedule 5.11          Employee Benefits Plans
Schedule 6.3           Noncontravention
Schedule 6.4           Brokers' Fees

**Schedule 1.1(a)**

**Deere Loan Contracts**

**Schedule 2.1(a)**

**Tangible Personal Property**

**Schedule 2.1(b)**

**Legal Description of Land Premises**

## Schedule 2.1(d)

## Assumed Contracts

1) Farming Lease between SMR Farms, LLC and C&D Fruit and Vegetable Co., Inc. dated September 13, 2011, as modified by (i) that certain Partial Termination dated July 17, 2012 (10 acres), (ii) that certain Farming Lease dated August 6, 2013 (10 acres), (iii) that certain Amendment to Farming Lease dated June 30, 2016, and (iv) that certain Second Amendment to Farming Lease dated August 7, 2017 (102 acres of land in Manatee County, Florida)

2) Farming Lease between SMR Farms, LLC and C&D Fruit and Vegetable Co., Inc. dated July 9, 2013, as modified by (i) that certain Amendment to Farming Lease dated June 30, 2014, (ii) that certain Second Amendment to Farming Lease dated August 24, 2016, and (iii) that certain Third Amendment to Farming Lease dated August 7, 2017 (106 acres of land in Manatee County, Florida)

3) Sublease between Pacific Tomato Growers, Ltd. and C&D Fruit and Vegetable Co., Inc. dated as of July 1, 2008, as modified by (i) that certain Assignment and Attornment Agreement by and among Pacific Tomato Growers, Ltd., Hecht Manatee Property, Ltd., and C&D Fruit and Vegetable Co., Inc. dated as of July 1, 2010 and (ii) that certain First Amendment to Lease dated as of February 26, 2015 between Hecht Manatee Property, Ltd.. and C&D Fruit and Vegetable Co., Inc. (173.3 acres of land in Parrish, Florida)

**Schedule 2.1(f)**

**Permits**

**Schedule 2.2(q)**

**Excluded Assets**

**Schedule 3.3(c)**

**New Crop Expenses**

**Schedule 5.3**

**Noncontravention**

**Schedule 5.4**

**Brokers' Fees**

**Schedule 5.5**

**Liens**

**Schedule 5.7**

**Intellectual Property**

**Schedule 5.8(a)**

**Real Property Liens**

**Schedule 5.8(b)**

**Leased Real Property**

1) Farming Lease between SMR Farms, LLC and C&D Fruit and Vegetable Co., Inc. dated September 13, 2011, as modified by (i) that certain Partial Termination dated July 17, 2012 (10 acres), (ii) that certain Farming Lease dated August 6, 2013 (10 acres), (iii) that certain Amendment to Farming Lease dated June 30, 2016, and (iv) that certain Second Amendment to Farming Lease dated August 7, 2017 (102 acres of land in Manatee County, Florida)

2) Farming Lease between SMR Farms, LLC and C&D Fruit and Vegetable Co., Inc. dated July 9, 2013, as modified by (i) that certain Amendment to Farming Lease dated June 30, 2014, (ii) that certain Second Amendment to Farming Lease dated August 24, 2016, and (iii) that certain Third Amendment to Farming Lease dated August 7, 2017 (106 acres of land in Manatee County, Florida)

3) Sublease between Pacific Tomato Growers, Ltd. and C&D Fruit and Vegetable Co., Inc. dated as of July 1, 2008, as modified by (i) that certain Assignment and Attornment Agreement by and among Pacific Tomato Growers, Ltd., Hecht Manatee Property, Ltd., and C&D Fruit and Vegetable Co., Inc. dated as of July 1, 2010 and (ii) that certain First Amendment to Lease dated as of February 26, 2015 between Hecht Manatee Property, Ltd.. and C&D Fruit and Vegetable Co., Inc. (173.3 acres of land in Parrish, Florida)

**Schedule 5.9**

**Litigation**

**Schedule 5.10(a)**

**Employees**

**Schedule 5.11**

**Employee Benefit Plans**

**Schedule 6.3**

**Noncontravention**

**Schedule 6.4**

**Brokers' Fees**